## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**ANGUS MCDOWELL, Derivatively on Behalf of Nominal Defendant, NATIONAL BEVERAGE CORP.,**

**Plaintiff,**

vs.

**GEORGE R. BRACKEN, NICK A. CAPORELLA, JOSEPH G. CAPORELLA, CECIL D. CONLEE, GREGORY P. COOK, SAMUEL C. HATHORN, JR., STANLEY M. SHERIDAN, CMA OF DELAWARE, INC., a Delaware Corporation, IBS PARTNERS LTD., a Texas Limited Partnership, and IBS MANAGEMENT PARTNERS, LTD., a Texas Corporation,**

**Defendants,**

and

**NATIONAL BEVERAGE CORP.,**

**Nominal Defendant.**

Case No.: 0:17-cv-61535-BB

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Chirstopher S. Polaszek
Florida Bar No. 0116866
**THE POLASZEK LAW FIRM, PLLC**
3407 W. Kennedy Blvd.
Tampa, FL 33606
Telephone: (813) 574-7678
Email: chris@polaszeklaw.com

Stuart J. Guber
(admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile: 215-277-5771

Nina M. Varindani
(admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

    A.    The Defendants ................................................................................. 2

    B.    The Management Agreement With CMA................................................ 4

    C.    N. Caporella's Personal Use of the Broad River Aircraft........................ 6

    D.    The False And Misleading Proxy Statements Signed by the
            Director Defendants ........................................................................... 7

ARGUMENT ......................................................................................................... 8

    A.    Standards Applicable to This Motion .................................................. 8

    B.    The Pleading Standards Applicable to Derivative Actions..................... 9

    C.    Demand is Excused Because Each of the Director Defendants is Interested or
            Lacks Independence .......................................................................... 12

            1.    Defendants N. Caporella and J. Caporella Lack Independence............... 13

            2.    Defendants Conlee, Hathorn and Sheridan Lack Independence Due
                 to Their Extensive Business Entanglements with N. Caporella and
                 Related Financial Interests ................................................................. 14

            3.    The Entire Board is Interested in the Outcome of this Litigation
                 Because They Face a Substantial Likelihood of Liability ....................... 18

    D.    Plaintiff's Claims Related to the Management Agreement are Subject to the
            Entire Fairness Standard ................................................................... 21

            1.    The Entire Fairness Standard Applies Anytime a Controlling
                 Shareholder Stands on Both Sides of a Transaction ................................ 22

            2.    The Entire Fairness Standard Applies To The Management Agreement
                 At Issue Here................................................................................... 24

            3.    Defendants Will Be Unable To Demonstrate That The Management
                 Agreement Is Fair ............................................................................ 25

    E.    The Complaint Properly States a Claim for Corporate Waste............................. 27

    F.    The Complaint Properly States a Claim for Violation of Section 14(a)............... 29

i

1.    False Statements Regarding the Aircraft ...................................................... 30

2.    False Statements Related to the Management Agreement........................ 30

3.    Plaintiff Has Alleged Loss Causation ........................................................ 31

4.    The Complaint Alleges Facts Giving Rise to a Strong Inference
      of Negligence. ............................................................................................. 32

CONCLUSION.................................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*In re Abbott Labs. Derivative S'Holders Litig.*,
  325 F.3d 795 (7th Cir. 2003) ........................................................................19, 20

*In re AFC Enters., Inc. Derivative Litig.*,
  224 F.R.D. 515 (N.D. Ga. 2004).........................................................................8

*Amalgamated Bank v. Yahoo! Inc.*,
  132 A.3d 752 (Del. Ch. 2016)...........................................................................26

*Ams. Mining Corp. v. Theriault*,
  51 A.3d 1213 (Del. 2012) ................................................................................21

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) .....................................................................9, 12, 28

*In re Baxter International*,
  654 A.2d 1268 (Del. Ch. 1995)..........................................................................20

*Beam v. Stewart*,
  845 A.2d 1040 (Del. 2004) ...............................................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007)..........................................8

*Braddock v. Zimmerman*,
  906 A.2d 776 (Del. 2006) .................................................................................10

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) .................................................................................28

*Carlson v. Hallihan*,
  925 A.2d 506 (Del. Ch. 2006)...........................................................................24

*In re Cendant Corp. Derivative Action Litig.*,
  189 F.R.D. 117 (D.N.J. 1999)...........................................................................18

*Chen v. Howard-Anderson*,
  87 A.3d 648 (Del. Ch. 2014).............................................................................26

*Combs v. PriceWaterhouse Coopers, LLP*,
  382 F.3d 1196 (10th Cir. 2004) ...................................................................27, 28

*In re Cooper Cos. S'holders Derivative Litig.*,
  C.A. No. 12584, 2000 Del. Ch. LEXIS 158 (Del. Ch. Oct. 31, 2000) ....................14

*In re Countrywide Fin. Corp. Derivative Litig.*,
 554 F. Supp. 2d 1044 (C.D. Cal. 2008) .....................................................19, 31

*In re Dairy Mart Convenience Stores, Inc.*,
 C.A. No. 14713, 1999 Del. Ch. LEXIS 94 (Del. Ch. May 24, 1999)....................................22

*Del. Cty. Emps. Ret. Fund v. Sanchez*,
 124 A.3d 1017 (Del. 2015) ..................................................................9, 11, 17, 18

*In re eBay, Inc., S'Holders Litig.*,
 C.A. No. 19988-NC, 2004 Del. Ch. LEXIS 4 (Del. Ch. Feb. 11, 2004) ................................13

*Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*,
 595 F. Supp. 2d 1253 (M.D. Fla. 2009)..............................................................29

*Emerald Partners v. Berlin*,
 C.A. No. 9700, 2003 Del. Ch. LEXIS 42 (Del. Ch. Apr. 28, 2003)......................................16

*In re EZCORP Inc.*,
 C.A. No. 9962-VCL, 2016 Del. Ch. LEXIS 14 (Del. Ch. Jan. 25, 2016).................. *passim*

*In re First Solar Derivative Litig.*,
 No. CV-12-00769-PHX-DGC,
 2016 U.S. Dist. LEXIS 86005 (D. Ariz. June 30, 2016) .........................................19

*Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. 12108-VCL,
 2017 Del. Ch. LEXIS 67 (Ch. Apr. 14, 2017) ....................................................26

*In re Freeport-McMoRan Sulphur, Inc. S'holder Litig.*,
 C.A. No. 16729, 2005 Del. Ch. LEXIS 96 (Del. Ch. June 30, 2005)....................................16

*Friedman v. Beninson*,
 C.A. No. 12232, 1995 Del. Ch. LEXIS 154 (Del. Ch. Dec. 4, 1995).....................................13

*Gantler v. Stephens*,
 965 A.2d 695 (Del. 2009) .......................................................................25

*Gaskins v. Nahmad*,
 Case No. 15-24707-CIV,
 2017 U.S. Dist. LEXIS 8245 (S.D. Fla. Jan. 19, 2017) .........................................19

*General Electric Co. v. Cathcart*,
 980 F.2d 927 (3d Cir. 1992).....................................................................31

*GPC XLI L.L.C. v. Loral Space & Comm'ns Consol. Litig.*,
 C.A. No. 3022-VCS, 2008 Del. Ch. LEXIS 136 (Del. Ch. Sept. 19, 2008)...........................22

*Grimes v. Donald*,
    673 A.2d 1207 (Del. 1996) .................................................................................10

*Harbor Fin. Partners v. Huizenga*,
    751 A.2d 879 (Del. Ch. 1999)......................................................................13, 14

*Harbor Fin. Partners ex. rel. Rally's Hamburgers v. Sugarman*,
    C.A. No. 14834-NC, 1997 Del. Ch. LEXIS 49 (Del. Ch. Apr. 3, 1997) ..........21, 22

*Haseotes v. Bentas*,
    C.A. No. 19155 NC, 2002 Del. Ch. LEXIS 106 (Del. Ch. Sept. 3, 2002).............11

*In re Home Depot Shareholder Derivative Litigation*,
    223 F. Supp. 3d 1317 (N.D. Ga. 2016) .................................................................31

*Hutton v. McDaniel*,
    No. CV-17-00727-PHX-JAT,
    2017 U.S. Dist. LEXIS 137869 (D. Az. Aug. 28, 2017) ...................................29, 32

*In re infoUSA, Inc. Shareholders Litigation*,
    953 A.2d 963 (Del. Ch. 2007)..............................................................................28

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
    C.A. No. 14995, 1997 Del. Ch. LEXIS 59 (Del. Ch. April 21, 1997)....................13

*James River Ins. Co. v. Ground Down Eng'g, Inc.*,
    540 F.3d 1270 (11th Cir. 2008) ...........................................................................8

*Kahn v. M&F Worldwide Corp.*,
    88 A.3d 635 (Del. 2014) .....................................................................................13

*Kahn v. Tremont Corp.*,
    C.A. No. 12339, 1996 Del. Ch. LEXIS 40 (Del. Ch. Mar. 21, 1996)....................22

*Kahn v. Tremont Corp.*,
    694 A.2d 422 (Del. 1997) ...................................................................................23

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991)..............................................................................................11

*Kupke v. Orange County*,
    293 Fed. Appx. 695 (11th Cir. 2008).....................................................................8

*Levco Alternative Fund Ltd. v. Reader's Digest Association, Inc.*,
    803 A.2d 428 (Del. 2002) ...................................................................................23

*McCabe v. Foley*,
    424 F. Supp. 2d 1315 (M.D. Fla. 2006)................................................................19

*McCall v. Scott,*
   239 F.3d 808 (6th Cir. 2001) ...................................................................19

*In re MFW S'holders Litig.,*
   67 A.3d 496 (Del. Ch. 2013)....................................................................24

*Michelson v. Duncan,*
   407 A.2d 211 (Del. 1979) ........................................................................27

*Mizel v. Connelly,*
   C.A. No. 16638, 1999 Del. Ch. LEXIS 157 (Del. Ch. July 22, 1999).........12, 13, 14

*In re New Valley Corp. Derivative Litig.,*
   C.A. No. 17649, 2001 Del. Ch. LEXIS 13 (Del. Ch. Jan. 11, 2001)................13, 22

*Nixon v. Blackwell,*
   626 A.2d 1366 (Del. 1993) ......................................................................23

*Orman v. Cullman,*
   794 A.2d 5 (Del. Ch. 2002).................................................................13, 17

*In re Oxford Health Plans, Inc. Sec. Litig.,*
   192 F.R.D. 111 (S.D.N.Y. 2000) ........................................................10, 18

*Parfi Holding AB v. Mirror Image Internet, Inc.,*
   794 A.2d 1211 (Del. Ch. 2001)................................................................21

*Quadrant Structured Products Co., Ltd. v. Vertin,*
   102 A.3d 155 (Del. Ch. 2014)..................................................................21

*Rales v. Blasband,*
   634 A.2d 927 (Del. 1993) ................................................................ *passim*

*Robbins & Co. v. A.C. Israel Enters., Inc.,*
   No. 7919, 1985 Del. Ch. LEXIS 498 (Del. Ch. Oct. 2, 1985) .................................13

*In re Rural Metro Corp. Stockholders Litig.,*
   88 A.3d 54 (Del. Ch. 2014)......................................................................26

*In re Sagent Tech., Inc., Derivative Litig.,*
   278 F. Supp. 2d 1079 (N.D. Cal. 2003) ...............................................28

*Shandler v. DLJ Merchant Banking, Inc.,*
   C.A. No. 4797-VCS, 2010 Del. Ch. LEXIS 154 (Del. Ch. July 26, 2010) .....................22, 28

*Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns.,*
   376 F.3d 1065 (11th Cir. 2004) ...................................................................8

*Steiner v. Meyerson*,
 C.A. No. 13139, 1995 Del. Ch. LEXIS 95 (Del. Ch. July 19, 1995).........................................13

*Summa Corp. v. Trans World Airlines, Inc.*,
 540 A.2d 403 (Del. 1988) ................................................................................................4, 21, 23

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
 770 A.2d 536 (Del. Ch. 2000)..................................................................................................22, 24

*Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*,
 119 A.3d 44 (Del. Ch. 2015)................................................................................................13

*In re The Student Loan Corp. Derivative Litig.*,
 No. 17799, 2002 Del. Ch. LEXIS 7 (Del. Ch. Jan. 8, 2002) ...................................................14

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
 No. 16-cv-05541-JST,
 2017 U.S. Dist. LEXIS 164824 (N.D. Cal. Oct. 4, 2017)......................................................31

**Statutes**

15 U.S.C. § 78n(a) ..............................................................................................................29, 30

**Other Authorities**

17 C.F.R. § 229.402 ......................................................................................................................30

## PRELIMINARY STATEMENT

This is a derivative action brought against National Beverage Corporation's ("NBC" or the "Company") Board of Directors (the "Board") and certain of its executive officers (collectively referred to herein as the "Individual Defendants" and, with the Company, the "Defendants"), as well as other related entities owned and/or controlled by Defendant Nick A. Caporella ("N. Caporella"), NBC's controlling shareholder, seeking to remedy the Defendants' violations of state law and breaches of fiduciary duty and Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") for issuing false and misleading proxy statements for fiscal years 2015, 2016 and 2017 through the present (the "2015-2017 Proxies").

Defendant N. Caporella is Chairman, CEO and the beneficial owner of 73.6% of NBC's outstanding common stock.  N. Caporella handpicked a Board consisting of his son and three business associates who each have shared a longstanding business relationship with N. Caporella, spanning over 30 years and two different companies.  This hand-picked Board was put in place to allow N. Caporella to funnel 1% of the Company's annual net sales – amounting to more than $6 million per year – to Corporate Manager Advisors, Inc. ("CMA"), another corporate entity he owns and which purportedly provides NBC with management and other services.  N. Caporella and his personally selected Board then issued false and misleading proxy statements to the minority shareholders so he could continue to collect these management fees and used a private jet for his own personal use (80% of which is owned by yet another corporation he controlled) at the Company's expense.

Defendants now seek to avoid any liability for this conduct by attempting to argue that it is an ordinary business transaction subject to the business judgement rule.  In fact, however, since N. Caporella was a controlling shareholder of NBC and sole owner of CMA, these transactions

1

are subject to scrutiny under the entire fairness standard.  Therefore, Defendants have the burden

to establish that these transactions were entirely fair to minority shareholders, a burden they fail to

carry in this motion.  Therefore, Defendants' motion should be denied.

## FACTUAL BACKGROUND

### A.    The Defendants

NBC was founded in 1985 and produces and distributes a portfolio of beverage brands that

are sold and distributed in the United States and abroad.  NBC is dominated and controlled by its

Chairman and Chief Executive Officer ("CEO") Defendant N. Caporella, who is the beneficial

owner of 73.6% of NBC's outstanding common stock.  ¶¶ 1, 16, 20.[1]  Defendant N. Caporella also

wholly owns Defendant CMA, to which NBC pays a management fee of one percent (1%) of

NBC's net sales ("Management Fee") each year.  ¶ 2, 17.  Defendant IBS Partners Ltd. ("IBS

Partners") is a Texas limited partnership whose sole general partner is IBS Management Partners,

Inc., a company which is also wholly-owned by N. Caporella.  ¶¶ 18-19.[2]

N. Caporella has used his control of the Company to pack the Board with relatives and

longtime business associates.  The Board currently consists of Defendants N. Caporella, his son

Joseph G. Caporella ("J. Caporella"), who also has served as President since 2002 (¶ 22), together

with three of N. Caporella's longtime business associates: Defendants Cecil D. Conlee ("Conlee")

(¶ 23), Samuel C. Hathorn, Jr. ("Hathorn") (¶ 25), and Stanley M. Sheridan ("Sheridan") (¶ 26).

¶¶ 27, 108.

As detailed below, Conlee, Hathorn and Sheridan all have longstanding business and

---

[1] All references herein to "¶__  are to the corresponding paragraphs of the Plaintiff's Verified
Shareholder Derivative Complaint (ECF No. 1).
[2] IBS Partners officially owns 33,302,246 or 71.5% of the 73.6% shares of NBC stock beneficially
owned by N. Caporella.

professional relationships with N. Caporella. Specifically, Defendant Conlee served as a lead director of Burnup & Sims (where N. Caporella was also President, CEO and Chairman) for more than 20 years, served on the Company's Strategic Planning Committee since 1995 and has served as an NBC director since 2009. ¶¶ 23, 108.[3] Similarly, Defendant Hathorn served as a director of Burnup & Sims from 1981 through 1997. Hathorn also served on NBC's Board during its formative years, from 1985 through September 1993. ¶¶ 25, 108. Hathorn returned to the NBC Board in June 1997 and has served on the Board without interruption since that time. ¶ 25. Likewise, Sheridan was employed by Faygo Beverages, Inc., a wholly-owned subsidiary of NBC, from 1974 through his retirement in 2004. Consequently, Sheridan has had a professional relationship with Defendant N. Caporella since at least May 1987, when Sheridan was named President of Faygo after it was acquired by NBC. ¶¶ 26, 108. Sheridan has served as an NBC director since 2009. ¶ 26. Conlee, Hathorn and Sheridan also make up the Audit Committee as well as the Compensation and Stock Option Committee of the Board. ¶¶ 23, 25, 26, 104. In short, the Board and each of its crucial committees consisted of the Company's dominating and controlling shareholder, his son and three business associates with relationships stretching back over 30 years.[4] Indeed, Conlee and Sheridan have approved the renewal of the unfair and illegal Management Agreement between CMA and NBC each and every year since 2009. Defendant Hathorn, has approved the renewal of the Management Agreement each and every year for more than the last 20 years.

---

[3] *See also* Declaration of Curtis S. Kowalk in Support of Defendants' Motion to Dismiss Plaintiff's Shareholder Derivative Complaint ("Kowalk Decl."), Exhibit D at 6 (ECF Nos. 26 – 26-8).
[4] The Individual Defendants consist of the Current Board Member Defendants, together with Defendants George R. Bracken ("Bracken"), Vice President of Finance (¶ 22), and Gregory P. Cook ("Cook"), Vice President – Controller and Chief Accounting Officer (¶ 24).

B.    **The Management Agreement With CMA**

Pursuant to a Management Agreement ("Management Agreement" or "Agreement"), the contents of which have never been fully disclosed to NBC Shareholders[5] is described as follows in the 2015-2017 Proxies:

> . . . CMA provides, subject to the direction and supervision of the Board of Directors of the Company, (i) *senior corporate functions* (including supervision of the Company's financial, legal, executive recruitment, internal audit and management information systems departments) as well as *the services of a Chief Executive Officer and Chief Financial Officer*, and (ii) *services in connection with acquisitions, dispositions and financings by the Company, including identifying and profiling acquisition candidates, negotiating and structuring potential transactions and arranging financing for any such transaction.* CMA, through its personnel, also provides, to the extent possible, *the stimulus and creativity to develop an innovative and dynamic persona for the Company, its products and corporate image*. ¶ 42 (emphasis added).

Pursuant to this Agreement, NBC, controlled by N. Caporella, pays CMA, wholly owned by N. Caporella, a management fee of one percent (1%) of NBC's net sales ("Management Fee"), totaling $6,458,254 for fiscal year ("FY") 2015, and $7,047,850 for FY 2016.  ¶¶ 2, 44.  Because N. Caporella stands on both sides of this transaction, the evaluation of this Agreement is subject to the entire fairness standard, and Defendants bear the burden of proving that the transaction is fair to the Company and its minority shareholders.  *See Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 406 (Del. 1988) ("It is well established in Delaware that one who stands on both sides of a transaction has the burden of proving its entire fairness.").

In fact, Defendants cannot meet this standard, because the Management Agreement is neither fair to the corporation nor has it ever been fully disclosed to shareholders.  The

---

[5] A copy of a draft version of the Management Agreement is attached to the Complaint as Exhibit ("Ex.") A.  The copy was procured through a Freedom of Information Act ("FOIA") request to the Securities and Exchange Commission ("SEC").  It is unsigned and is stamped "DRAFT", and no final and executed version is publicly available.  ¶ 2 n.4.

Management Fee was purportedly paid to compensate Defendants N. Caporella and Bracken, as well as other undisclosed personnel provided by CMA, to fulfill each of CMA's responsibilities under the Agreement.  As detailed in the Complaint, however, the "senior corporate functions," i.e., administrative functions (¶¶ 48-57), the "stimulus and creativity" functions (¶¶ 58-61), as well as the legal functions (¶¶ 62-68) required under the CMA Management Agreement were actually performed or duplicated by NBC employees and paid for, in whole or in part, by NBC.  At the very least, it is unclear who does what at NBC and whether they are an employee of CMA or of NBC itself.

Furthermore, even though the 2015-2017 Proxies claimed the 1% Management Fee covered all the services provided by CMA, in reality, the Individual Defendants failed to disclose and continue to fail to disclose that the Company was also paying the costs (and what those costs are) of providing CMA employees with healthcare, life and disability insurance (if any), any non-cash compensation, and any matching Company contributions that CMA employees may benefit from as participants in NBC's 401K plan.  ¶¶ 9, 90.  Moreover, directly contrary to the representations in the 2015-2017 Proxies, "services in connection with acquisitions, dispositions and financings by the Company" were likewise not covered by the 1% Management Fee, but would result in "a[n] [additional] fee for rendering advice and expertise in connection with a significant transaction … negotiated on an individual basis by . . . [CMA] and the Board of Directors of the Company." ¶ 6.

Additionally, Defendants never disclosed the amount or percentage of the Management Fee which is used to compensate N. Caporella or any of the other personnel, except for the cash compensation paid to Bracken.  ¶ 2.  Consequently, the creation of CMA appears to be little more

than a structure to allow N. Caporella to syphon off 1% of the Company's annual net sales with no accountability.

Further, the Management Agreement contains an illegal "Standard of Care" clause that purports to exonerate CMA or any of its employees acting on its behalf in connection with its duties and responsibilities under the Management Agreement "for any acts or omissions of any kind, unless caused by intentional misconduct of . . . [CMA] engaged in by . . . [CMA] in bad faith." ¶¶ 5, 71-72, 89. That is directly contrary to well-established Delaware law, which only permits exculpation of a company's directors (not officers or other employees) under Section 102(b)(7) of Delaware corporate law. The Management Agreement also contains an onerous termination clause that requires one year's written notice permitting CMA to maintain day-to-day control of NBC's operations for an entire year, although they have already been terminated. ¶¶ 73, 89. Finally, the Management Agreement was for a term of one year, renewable annually. ¶ 5. Thus, despite each of the egregious terms of the Agreement, the Board has annually approved the Management Agreement to automatically renew each year, allowing N. Caporella and his cronies to continue lining their own pockets with the proceeds.

C.    **N. Caporella's Personal Use of the Broad River Aircraft**

The Company's SEC filings reflect that CMA is a twenty percent (20%) owner of an aircraft ("Aircraft"). The same filings fail to disclose that the remainder of the Aircraft is owned by Broad River Aviation, Inc. ("Broad River"), an entity that is managed by Defendants N. Caporella and Bracken, and previously by J. Caporella. Despite NBC's affiliation with Broad River, the Company has never disclosed anything about Broad River in its SEC filings, nor has the Company disclosed N. Caporella's, J. Caporella's or Bracken's management of Broad River. ¶¶ 7, 75-76. Moreover, despite NBC's repeated statements in its SEC filings that the only perquisite

6

provided to its employees (beyond health, retirement and insurance benefits) is a car allowance, N. Caporella has used the Aircraft for personal trips while NBC has foot the bill for those trips, including reimbursing the pilot and other CMA/NBC employees for their expenses.  ¶¶ 8, 77-80, 85 (identifying specific flights).

D.       **The False And Misleading Proxy Statements Signed by the Director Defendants**

The 2015-2017 Proxies caused to be issued by the Board violated §14(a) of the Exchange Act and SEC Rule 14a-9 because each contained false statements and omitted material facts necessary to make the discussion of the Aircraft and the perquisites offered to NBC employees not false and misleading.  As detailed above, the 2015-2017 Proxies failed to disclose that: (i) N. Caporella, J. Caporella and Bracken were and/or are affiliated with Broad River; (ii) that Broad River is the predominant owner of the Aircraft; and (iii) that certain of the Individual Defendants (including, but not limited to, N. Caporella) utilized the Aircraft for personal trips.  ¶ 123.  The 2015-2017 Proxies also failed to disclose the other material terms specified above in connection with the Management Agreement, including the illegal Standard of Care provision, onerous 1-year termination clause and additional fees to be earned by CMA concerning significant transactions. ¶ 124.  Indeed, the 2015-2017 Proxies falsely assert that the 1% Management Fee includes "services in connection with acquisitions, dispositions and financings by the Company, including identifying and profiling acquisition candidates, negotiating and structuring potential transactions and arranging financing for any such transactions." ¶ 89.  We know this statement is false because the Management Agreement specifically entitles CMA to negotiate an additional fee, up and above the 1%, for any such significant transactions.

<u>**ARGUMENT**</u>

**A.** <u>**Standards Applicable to This Motion**</u>

The pleading standards applicable to this motion under Rule 12(b)(6) are quite lenient. *Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns.*, 376 F.3d 1065, 1070 (11th Cir. 2004). "To survive dismissal, the complaint's allegations must plausibly suggest that the [plaintiff] has a right to relief, raising that possibility above a speculative level . . ." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (internal quotations omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)). Once such a claim has been stated adequately, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp.*, 550 U.S. at 563. Furthermore, on a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff, accepting as true the material allegations in the complaint as well as any reasonable inferences to be drawn therefrom. *See Kupke v. Orange County*, 293 Fed. Appx. 695, 696 (11th Cir. 2008); *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1070. Moreover, such "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp.*, 550 U.S. at 556 (quotation omitted).

Even in derivative actions, "notice pleading is all that is required for a valid complaint." *In re AFC Enters., Inc. Derivative Litig.*, 224 F.R.D. 515, 517 (N.D. Ga. 2004) (citing *Lombard's Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985)). Thus, even under Delaware law applicable to demand futility, on a motion to dismiss a derivative action, plaintiffs are not required to plead evidence, nor is proof of success of the merits required. *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). In sum, "[a]lthough there is a heightened burden under Rule 23.1 to plead

particularized facts, when a motion to dismiss for failure to make a demand is made, all reasonable inferences from the pled facts must nonetheless be drawn in favor of the plaintiff in determining whether the plaintiff has met its burden under *Aronson*." *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015).

The Complaint in this action more than satisfies these standards.

**B.      The Pleading Standards Applicable to Derivative Actions**

Under Delaware law, it is well-settled that a pre-suit demand on a corporate board of directors need not be made if the facts alleged tend to demonstrate such a demand would have been futile. *Aronson v. Lewis*, 473 A.2d 805, 807-08 (Del. 1984), *overruled in part on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). To establish demand futility with respect to a specific business decision of the Board under *Aronson*, the plaintiff must show either (1) a reason to doubt that the directors are disinterested and independent, or (2) a reason to doubt that the challenged transaction was the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814. Where a complaint asserts a violation of the oversight duties of the Board, the plaintiff must show a reason to doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. *Rales*, 634 A.2d at 934. Under either standard, demand is excused where the complaint raises a ***reasonable doubt*** that a majority of the directors are disinterested ***or*** independent. *Id.* at 930; *Aronson*, 473 A.2d at 807. Under this test:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a ***reasonable doubt*** that, ***as of the time the complaint is filed***, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales*, 634 A.2d at 934 (emphasis added). As other courts have pointed out when discussing this area of Delaware law: "there is no one test used to determine demand futility, since the issue is

fact intensive and no two cases are alike." *In re Oxford Health Plans, Inc. Sec. Litig.,* 192 F.R.D. 111, 116 (S.D.N.Y. 2000) (excusing demand under Delaware law).

As explained by the Delaware Supreme Court, "the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence. . . ." *Grimes v. Donald*, 673 A.2d 1207, 1217 n.17 (Del. 1996), *overruled in part on other grounds sub nom.*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). This reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here,] the claim is not based on mere suspicions or stated solely in conclusory terms." *Id.* at 1217. This reasonable doubt standard promotes a strong public policy, since "the derivative suit . . . [is a] potent tool[] to redress the conduct of a torpid and unfaithful management." *Rales*, 634 A.2d at 933. Such a standard is particularly appropriate in derivative suits, because plaintiff typically has not had the benefit of discovery. *Id.* at 934 (requiring probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").

In sum, under well-established Delaware law, Plaintiffs need only raise "a ***reasonable doubt*** that, ***as of the time the complaint was filed***, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Braddock v. Zimmerman*, 906 A.2d 776, 785 (Del. 2006) (emphasis added) (citing *Rales*, 634 A.2d at 934). Defendants casually dispense with the bulk of these allegations of the Complaint by labeling them mere "boilerplate." Defs' Mem. at 12.[6] It defies commonsense to expect this same Board to make independent and disinterested decisions regarding the viability of the claims

---

[6] All references herein to Defendants' Motion to Dismiss Plaintiff's Verified Shareholder Derivative Complaint and Incorporated Memorandum of Law shall be known as "Defs' Mem" (ECF No 25).

asserted in the Complaint.  As Defendants concede, Plaintiff need only demonstrate that three of the five directors are incapable of independently and disinterestedly evaluating a demand.  Defs' Mem. at 7.  The detailed factual allegations of the Complaint raise a ***reasonable doubt*** as to all five of the Director Defendants ability to independently and disinterestedly evaluate the claims asserted in the complaint, even though Plaintiff is only required to demonstrate a reason to doubt the independence or disinterest of a majority of the directors here, just three.  *Rales,* 634 A.2d at 934.[7]  Thus, under well-established Delaware law, any demand on such a Board would be nothing more than a futile gesture.  *See, e.g., Haseotes v. Bentas,* C.A. No. 19155 NC, 2002 Del. Ch. LEXIS 106, at *13 (Del. Ch. Sept. 3, 2002) ("A lack of independence may be shown where the particularized facts pled in the complaint establish a reasonable doubt whether the director is able to consider impartially a demand when 'financial, familial, or other relationships' with the conflicted director are implicated.")

Defendants argue that demand futility must be conducted claim by claim.  Such a piecemeal analysis is not necessary or appropriate in this action.  Each of the claims asserted in the Complaint arise from the same common facts: N. Caporella essentially treated NBC as his private piggy bank.  First, he created CMA to syphon off 1% of the Company's net sales as annual compensation, to the tune of over $6,000,000 every year since at least FY 2012.[8]  Then, he used NBC to pay for his personal travel by private jet.  Then, N. Caporella and his hand-picked Board disseminated false and misleading 2015-2017 Proxies to conceal these practices and the unfair Management Agreement from Company shareholders.  As such, a holistic analysis of demand is proper in this case.  *See Del. Cty. Emps. Ret. Fund*, 124 A.3d at 1022 (the "law requires that all the pled facts

---

[7] The parties agree that Delaware substantive law is applicable to the demand futility analysis.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991).
[8] Kowalk Decl., Exhibits D-F.

regarding a director's relationship to the interested party be considered in full context in making the, admittedly imprecise, pleading stage determination of independence.").

### C. Demand is Excused Because Each of the Director Defendants is Interested or Lacks Independence

A particular director is disqualified from considering a demand where there is a reasonable doubt that he is either "interested" *or* lacks "independence." *Rales*, 634 A.2d at 935-37. Pursuant to this well-established principle of Delaware law,

> Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation or the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.

*Id.* at 936 (citations omitted). Thus, a director is interested where they face a substantial likelihood of liability. *Aronson*, 473 A.2d at 815.

Independence, on the other hand "means that a director's decision is based on the corporate merits of the subject before the board *rather than extraneous considerations or influences*." *Aronson*, 473 A.2d at 816 (emphasis added). A director also lacks independence where he or she is "beholden" to interested directors *or* "so under their influence that [his or her] discretion would be sterilized." *Rales*, 634 A.2d at 935-37. (citations omitted). Among other situations, a lack of independence has been found where: (i) a director holds a position as an employee of the corporation;[9] (ii) there are familiar relations which necessarily exert considerable influence over

---

[9] *Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices."). *See also Mizel v. Connelly*, C.A. No. 16638, 1999 Del. Ch. LEXIS 157, at *8-9 (Del. Ch. July 22, 1999) ("Since [the employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.").

the director;[10] (iii) a corporation's majority stockholder exerts "considerable influence" over the director;[11] (iv) there are "current or past business, personal, and employment relationships with each other and the entities involved;"[12] (v) there is "a clear pattern of mutual advantage" between the directors;[13]and (vi) a director receives monetary benefits.[14]  The fact that a director qualifies as an independent director pursuant to NASDAQ listing standards does not replace the need to perform an analysis of independence for demand futility purposes.  *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 648 n.26 (Del. 2014); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015).  Moreover, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of a plaintiff's allegations in combination may be sufficient to do so.  *Int'l Equity Capital Growth Fund*, 1997 Del. Ch. LEXIS 59, at *15.

### 1.    Defendants N. Caporella and J. Caporella Lack Independence

Defendants cannot, nor do they attempt to, show that Defendants N. Caporella and J. Caporella are not independent nor disinterested.  Defs' Mem. at 6.  N. Caporella is hopelessly

---

[10] *See Mizel*, 1999 Del. Ch. LEXIS 157, at *12-13.

[11] *See Friedman v. Beningson*, C.A. No. 12232, 1995 Del. Ch. LEXIS 154, at *15 (Del. Ch. Dec. 4, 1995); *Robbins & Co. v. A.C. Israel Enters., Inc.*, No. 7919, 1985 Del. Ch. LEXIS 498, at *13, (Del. Ch. Oct. 2, 1985) ("This Court and others have recognized that substantial minority interests ranging from 20% to 40% often provide the holder with working control.").

[12] *In re New Valley Corp. Derivative Litig.*, C.A. No. 17649, 2001 Del. Ch. LEXIS 13, at *25 (Del. Ch. Jan. 11, 2001).

[13] *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, C.A. No. 14995, 1997 Del. Ch. LEXIS 59, at *14 (Del. Ch. April 21, 1997).  *See also Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (a "long-standing pattern of mutually advantageous business relations" between directors raises a reasonable doubt regarding independence).

[14] *In re eBay, Inc., S'Holders Litig.*, C.A. No. 19988-NC, 2004 Del. Ch. LEXIS 4, at *7-11 (Del. Ch. Feb. 11, 2004) (finding that demand was excused as futile where a director received stock options, including not-yet-vested options, that created a reasonable doubt as to the director's independence).  *See also Orman v. Cullman*, 794 A.2d 5, 30 (Del. Ch. 2002) (finding that at the pleading stage it was reasonable to infer that consulting fees of $75,000 made the director beholden to the controlling shareholder for continued fees); *Steiner v. Meyerson*, C.A. No. 13139, 1995 Del. Ch. LEXIS 95, at *10 (Del. Ch. July 19, 1995).

conflicted with respect to the claims related to the Management Agreement and his personal use of the Aircraft at the Company's expense.  Moreover, both N. Caporella and J. Caporella are highly paid officers and have exercised control over Broad River and the Aircraft.  *See Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [a director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"); *In re The Student Loan Corp. Derivative Litig.*, No. 17799, 2002 Del. Ch. LEXIS 7, at *3 (Del. Ch. Jan. 8, 2002) (allegations that a director owes their livelihood to their employer, without elaboration on the exact compensation, sufficient to show lack of independence).  Moreover, as the son of the controlling shareholder, J. Caporella is additionally conflicted.  *See In re EZCORP Inc.*, C.A. No. 9962-VCL, 2016 Del. Ch. LEXIS 14, at *122 (Del. Ch. Jan. 25, 2016) ("Delaware decisions have taken a realistic approach to the ability of a director to consider a litigation demand when moving forward with the litigation would have an adverse interest on a close family member"); *In re Cooper Cos. S'holders Derivative Litig.*, C.A. No. 12584, 2000 Del. Ch. LEXIS 158, at *18 (Del. Ch. Oct. 31, 2000) (the "family relationship" between father-in-law and son-in-law "is sufficient to create a reason to doubt [the father-in-law's] ability to impartially consider a demand"); *Harbor Fin. Partners*, 751 A.2d at 889 ("[c]lose familial relationships between directors can create a reasonable doubt as to impartiality"); *Mizel*, 1999 Del. Ch. LEXIS 157, at *12 ("'reasonable doubt' is raised when a demand would require a director to support a suit contrary to the interests of a close family member.").

> **2.**     **Defendants Conlee, Hathorn and Sheridan Lack Independence Due to Their Extensive Business Entanglements with N. Caporella and Related Financial Interests**

Courts have recognized that longstanding business relationships may render a director unable to evaluate a demand independently and disinterestedly.  Similarly, courts have recognized that financial interests and incentives may render a director unable to evaluate a demand independently and disinterestedly.  In the present case, N. Caporella has had a strong business

14

relationship with board members Conlee, Hathorn and Sheridan that spans over three decades. Furthermore, Conlee, Hathorn and Sheridan have been generously compensated for their service on the Board through a combination of cash and stock options.  Since N. Caporella is a controlling shareholder standing on both sides of the transactions being challenged in this litigation he clearly has a self-interest and is tainted precluding his independence and disinterestedness. As his son and family member, J. Caporella is equally infected.   That is two of the five directors that suffer from infirmities.  Plaintiff only needs to demonstrate the lack of independence or disinterestedness of one of the remaining three directors in order to show that making a demand upon the board is futile.  That task is easily satisfied.

N. Caporella was the President and CEO of Burnup & Sims from 1976 through March 1994, as well as Chairman from 1979 through March 1994.  ¶ 20.  During that period, Conlee was the lead director of Burnup & Sims for 20 years.  ¶ 23.  Conlee also has served as member of the Company's Strategic Planning Committee since 1995 and as a Director of the Company since 2009.  ¶ 23.[15]  According to NBC's proxy statements, Conlee received compensation of $109,172 for 2016 and $114,027 for 2015.[16]  Conlee has also accumulated a significant amount of common stock and unvested stock options throughout the years for his service on the Board.  As of the 2017 proxy statement, Conlee owned 45,048 shares with a market value of more than $4.0 million.[17]

Hathorn served as a Burnup & Sims director while also serving on NBC's Board from the Company's inception in 1985 through September 1993, which includes the time period when the Agreement was implemented. ¶ 25. Hathorn returned to NBC's Board in June 1997 and has continuously served on the Board since that time.  ¶ 25.  Hathorn retired in September 2007 from

---

[15] Kowalk Decl., Exhibit D at 6.
[16] Kowalk Decl., Exhibits D and E.
[17] Kowalk Decl., Exhibit D at 2.

his position at Trendmaker Homes, Inc. (¶ 25) and, presumably, since that time his only source of non-passive income is compensation he receives as an NBC director.  According to NBC's proxy statements, Hathorn received compensation of $65,800 for 2016 and $136,258 for 2015.[18]  Hathorn has also accumulated a significant amount of common stock and unvested stock options throughout the years for his service on the Board.  As of the 2017 proxy statement, Hathorn owned 96,228 shares with a market value of more than $9 million.[19]

Sheridan joined Faygo Beverages, Inc. ("Faygo"), a wholly-owned subsidiary of NBC, in 1974 as Chief Financial Officer, and was promoted to President of Faygo in May 1987 when Faygo was acquired by NBC.  ¶ 26.  Sheridan was employed by Faygo until his retirement in 2004.  *See Emerald Partners v. Berlin*, C.A. No. 9700, 2003 Del. Ch. LEXIS 42, at *3 (Del. Ch. Apr. 28, 2003) (holding that a director who had been an employee of the controller for more than ten years was not disinterested and independent); *see also In re Freeport-McMoRan Sulphur, Inc. S'holder Litig.*, C.A. No. 16729, 2005 Del. Ch. LEXIS 96, at *43-44 (Del. Ch. June 30, 2005) ("Latiolais had worked for the Common Directors for almost twenty years and had become a wealthy individual in their employ . . . Delaware law recognizes that such extensive ties can operate as an exception to the general rule that past relationships do not call into question a director's independence.").  Since joining NBC's Board in 2009, Sheridan's only source of non-passive income, presumably, has been from his role as an NBC director.  According to NBC's proxy statements, Sheridan received compensation of $54,900 for 2016 and $90,884 for 2015.[20] Sheridan has accumulated a significant amount of common stock and unvested stock options

---

[18] Kowalk Decl., Exhibits D and E.
[19] Kowalk Decl., Exhibit D at p. 2.
[20] Kowalk Decl., Exhibits D and E.

throughout the years for his service on the Board.  As of the 2017 proxy statement, Sheridan owned

37,976 shares with a market value of more than $3.6 million.[21]

The Court in this instance should draw the inference that long-standing business ties across

two companies existed between N. Caporella and Conlee extending back approximately 40 years,

Hathorn extending back over 30 years and Sheridan extending back over 30 years.

As explained by the Delaware Chancery Court:

> Although mere recitation of the fact of past business or personal relationships will
> not make the Court automatically question the independence of a challenged
> director, it may be possible to plead additional facts concerning the length, nature
> or extent of those previous relationships that would put in issue that director's
> ability to objectively consider the challenged transaction.  *See, e.g., In re Ply Gem
> Industries, Inc. Shareholders Litig.*, 2001 Del. Ch. LEXIS 123, Del. Ch., C.A. No.
> 15779-NC, at *4, Noble, V.C. (Sept. 28, 2001) (stating that "past benefits conferred
> by [the allegedly dominating director], or conferred as the result of [that director's]
> position with Ply Gem, *may establish an obligation or debt (a sense of 'owingness')*
> upon which a reasonable doubt as to a director's loyalty to a corporation may be
> premised") (emphasis added); *In re New Valley Corp. Derivative Litig.*, 2001 Del.
> Ch. LEXIS 13, Del. Ch., C.A. No. 17649, at *25, Chandler, C. (Jan. 11, 2001)
> (noting in connection with the Court's consideration of allegations of interest and
> lack of independence that, "the facts alleged in the complaint show that all the
> members of the current Board have current or past business, personal, and
> employment relationships with each other and the entities involved") (emphasis
> added).

*Orman*, 794 A.2d at 27 n.55; *see also Del. Cty Emps. Ret. Fund*, 124 A.3d at 1022 ("People drift

apart for many reasons, and when a close relationship endures for that long [50 years], a pleading

stage inference arises that it is important to the parties.").  Thus, the Court must look at all of the

facts and draw all reasonable inferences in favor of Plaintiff to determine whether the facts

"suggest the director might be an easy tool, deferential, glad to be of use.  William T. Allen,

*Independent Directors in MBO Transactions: Are They Fact or Fantasy*, 45 Bus. Law. 2055, 2061

(1990) (quoting T.S. Eliot, *The Love Song of J. Alfred Prufrock, in Collected Poems 1909-1962*

---

[21] Kowalk Decl., Exhibit D at 2.

(Harcourt, Brace & World 1970)).” *In re EZCORP Inc.*, 2016 Del. Ch. LEXIS 14, at *132 (internal quotes omitted).

In this case, the only reasonable inference is that when N. Caporella needed directors to rubber stamp the approval of the Management Agreement and look the other way when he flew by private jet at the Company's expense, N. Caporella sought out business associates he had known for thirty plus years because they would be deferential to his control.  As a result, any demand upon Defendants Conlee, Hathorn and Sheridan would be futile.

Defendants reliance upon *Beam v. Stewart*, 845 A.2d 1040 (Del. 2004) is misplaced.  Just as in *Delaware County Employees Retirement Fund*, 124 A.3d at 1022, Plaintiff "did not plead the kind of thin social-circle friendship, for want of a better way to put it, which was at issue in *Beam*." Instead, Plaintiff alleged decades of business ties across two companies.  "People drift apart for many reasons, and when a close relationship endures for that long, a pleading stage inference arises that it is important to the parties." *Id.*

### 3. The Entire Board is Interested in the Outcome of this Litigation Because They Face a Substantial Likelihood of Liability

Delaware courts have recognized that directors are sufficiently "interested" to render demand futile where they face a "substantial likelihood" of liability for the wrongful conduct alleged in the complaint.  *See Rales*, 634 A.2d at 936.  Directors may face a such a substantial likelihood of liability for the issuance of false and misleading financial statements.  *Oxford Health*, 192 F.R.D. at 118 (demand excused where defendants violated fiduciary duties by allowing others to make materially false or misleading statements concerning the company's financial matters); *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 128-29 (D.N.J. 1999) (demand excused where complaint alleged overstated financial results which were publicly disseminated).  Demand is also excused where directors fail to disclose known material facts which they are obligated to

disclose.  *In re First Solar Derivative Litig.*, No. CV-12-00769-PHX-DGC, 2016 U.S. Dist. LEXIS

86005, at *18 (D. Ariz. June 30, 2016).

> A director is liable for "failure of oversight" type claims where he demonstrates a
> "lack of good faith as evidenced by a sustained or systematic failure . . . to exercise
> reasonable oversight," *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971
> (Del. Ch. 1996), or an intentional failure "to act in the face of a known duty to act,
> demonstrating a conscious disregard for his duties," *Stone v. Ritter*, 911 A.2d 362,
> 369 (Del. Ch. 2006) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del.
> 2006)).

*In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1077 (C.D. Cal. 2008).

In order to sustain such a *Caremark* claim for lack of oversight, Plaintiff must properly

show "either (1) that the directors knew or (2) should have known that violations of law were

occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent

or remedy that situation, and (4) that such failure proximately resulted in the losses complained of

. . ."  *McCabe v. Foley*, 424 F. Supp. 2d 1315, 1323-24 (M.D. Fla. 2006) (quoting *In re Caremark

Int'l Derivative Litig.*, 698 A.2d at 971).  Thus, "[i]n order to successfully plead a *Caremark* claim,

the complaint must allege, with sufficient particularity, a 'sustained or systematic failure of the

board to exercise oversight - such as an utter failure to attempt to assure a reasonable information

system exists.'" *Id.*; *see also Gaskins v. Nahmad*, Case No. 15-24707-CIV, 2017 U.S. Dist. LEXIS

8245, at *18-20 (S.D. Fla. Jan. 19, 2017).

In the present case, not only were Conlee, Hathorn and Sheridan members of the Board,

but each was a member of the Audit[22] and Compensation Committees of the Board.  In these

---

[22] Under Delaware law, the substantial likelihood test is satisfied where plaintiffs allege sufficient
facts to support the inference that an Audit Committee allowed the Company to engage in
imprudent or unlawful conduct and breached their fiduciary duty of good faith by declining to take
corrective action.  *Countrywide*, 554 F. Supp. 2d at 1077; *In re Abbott Labs. Derivative S'Holders
Litig.*, 325 F.3d 795, 808, 809 (7th Cir. 2003); *McCall v. Scott*, 239 F.3d 808, 820 (6th Cir. 2001)
("*McCall I*").

capacities, each year Conlee, Hathorn and Sheridan reviewed and approved the Company's financial statements as well as the 2015-2017 Proxies. Nevertheless, they allowed the Company to issue false financial statements which concealed N. Caporella's personal use of the Aircraft at the Company's expense, and allowed the Management Agreement to be misrepresented. Moreover, year after year they approved the automatic renewal of the Management Agreement with CMA, despite the egregious terms and lack of accountability for the services provided thereunder. Both of these practices were not one time events, but were a "'sustained and systematic failure of the board to exercise oversight,'" and therefore subject Conlee, Hathorn and Sheridan to a substantial likelihood of liability for breach of the "the duty of care, the duty of loyalty, and the duty of good faith." *In re Abbott Labs*, 325 F.3d at 808, 809 (quoting *Caremark*, 698 A.2d at 972). Such a sustained and systematic failure constitutes bad faith, intentional misconduct, or a knowing violation of law subjecting Defendants to liability under *In re Baxter International*, 654 A.2d 1268, 1270 (Del. Ch. 1995) despite the exculpatory provisions of the Company's articles of incorporation. Defs' Mem. at 12. Hathorn has taken part in the approval of the Management Agreement since its inception in 1992 and then every year since 1996 with the exception of a few years when he was not a member of the Board. *See In re EZCORP Inc.*, 2016 Del. Ch. LEXIS 14, at *131 ("Roberts' starting point for evaluating a litigation demand would not just involve one prior decision that he had made . . . [i]t would involve eight prior decisions. It seems reasonable at the pleading stage to infer that Roberts could have difficulty reversing this pattern and authorizing a suit."). Furthermore, since both the Management Agreement and the Aircraft usage were for the benefit of a controlling shareholder, these allegations will be subject to the entire fairness standard and Defendants will have the burden of establishing that the Management

20

Agreement and N. Caporella's personal use of the Aircraft were entirely fair to the minority shareholders, thus increasing the substantial likelihood of their liability.

**D.    Plaintiff's Claims Related to the Management Agreement are Subject to the Entire Fairness Standard**

Defendants concede that controlling shareholder N. Caporella stands on both sides of the Management Agreement.   N. Caporella is the controlling shareholder of NBC; he beneficially owns 73.6% of NBC's outstanding common stock and serves as its Chairman and CEO, and simultaneously, is the owner and president of CMA.   Accordingly, the Management Agreement between NBC and CMA is required to meet the entire fairness threshold, and therefore Defendants bear the burden of proving that the transaction is entirely fair to the minority shareholders.   *See Summa Corp.,* 540 A.2d at 406 ("It is well established in Delaware that one who stands on both sides of a transaction has the burden of proving its entire fairness.");[23] *In re EZCORP Inc.,* 2016 Del. Ch. LEXIS 14, at *41.

Defendants mistakenly argue that Plaintiff asks the court to apply the entire fairness standard to supplant the *Aronson* demand futility analysis.   Quite the contrary, Plaintiff instead asks the Court to use the entire fairness standard to properly evaluate the second prong of the *Aronson*, as has been done by Delaware Courts.   *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1231 n. 47 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002) (applying entire fairness standard under the second prong of *Aronson* where the director of one corporation also serves as a director for the other corporation in the challenged transaction).

---

[23] *See also Ams. Mining Corp. v. Theriault,* 51 A.3d 1213, 1239 (Del. 2012) (explaining that defendants bear the burden of proving that a transaction with the controlling stockholder was entirely fair to the minority stockholders); *Quadrant Structured Products Co., Ltd. v. Vertin,* 102 A.3d 155, 185 (Del. Ch. 2014) (where governing standard is entire fairness the burden of proof is on defendants); *Harbor Fin. Partners ex. rel. Rally's Hamburgers v. Sugarman*, C.A. No. 14834-NC, 1997 Del. Ch. LEXIS 49, at *5 (Del. Ch. Apr. 3, 1997) ("defendants . . . have the burden of proving that the transaction was entirely fair").

1.    **The Entire Fairness Standard Applies Anytime a Controlling Shareholder Stands on Both Sides of a Transaction**

Under Delaware law, and contrary to Defendants' contention limiting its application to squeeze-out mergers, the overwhelming majority of cases hold that the entire fairness standard applies anytime a controlling shareholder stands on both sides of the transaction.  *In re EZCORP Inc.,* 2016 Del. Ch. LEXIS 14, at *96 (applying entire fairness standard to consulting agreement with company owned by controlling shareholder and stating, "this decision hews to the weight of precedent regarding how Delaware law approaches transactions in which a controlling stockholder receives a non-ratable benefit.").[24]

---

[24] *See, e.g., Kahn v. Tremont Corp. ("Tremont I")*, C.A. No. 12339, 1996 Del. Ch. LEXIS 40, at *24 (Del. Ch. Mar. 21, 1996) (applying entire fairness to Tremont Corp.'s purchase of 15% of stock of NL, Industries, Inc. from Valhi, Inc. where controller controlled all three corporations in which Chancellor Allen "rejected the defendant's attempt to limit entire fairness review to squeeze-out mergers, stating that there is 'no plausible rationale for a distinction between mergers and other corporate transactions and in principle I perceive none.'"); *T. Rowe Price Recovery Fund, L.P. v. Rubin,* 770 A.2d 536, 551 (Del. Ch. 2000) (applying entire fairness standard to services agreement between Seaman Furniture Company and another company owned by Seaman's controlling shareholder where Vice Chancellor Lamb rejected defendants' argument that the business judgment rule applied because the contract was "not a merger but a 'business transaction.'"); *Harbor Fin.,* 1997 Del. Ch. LEXIS 49, at *6 (applying entire fairness framework to a company's repurchase of a block of its notes from its controlling shareholder and former Justice Jacobs, then a Vice Chancellor, explained "[t]he rule that a controlling shareholder may not benefit from dealings with the corporation to the detriment of other stockholders is not limited to mergers."); *Shandler v. DLJ Merchant Banking, Inc.,* C.A. No. 4797-VCS, 2010 Del. Ch. LEXIS 154, (Del. Ch. July 26, 2010) (applying entire fairness standard to transaction where Insilco Technologies, Inc. sold assets to an affiliate of Donaldson, Lufkin & Jenrette, Inc., its controlling shareholder); *GPC XLI L.L.C. v. Loral Space & Comm'ns Consol. Litig.*, C.A. No. 3022-VCS, 2008 Del. Ch. LEXIS 136, at *5 (Del. Ch. Sept. 19, 2008) (Chief Justice Strine, then a Vice Chancellor, applied entire fairness standard to a transaction in which company's controlling shareholder invested $300 million in return for "convertible preferred stock with a high dividend rate and low conversion rate compared to the market comparables identified by its advisor."); *In re New Valley Corp.,* 2001 Del. Ch. LEXIS 13 (Chancellor Chandler applied entire fairness standard to a company's purchase of a subsidiary from its controlling shareholder); *In re Dairy Mart Convenience Stores, Inc.,* C.A. No. 14713, 1999 Del. Ch. LEXIS 94 (Del. Ch. May 24, 1999) (Chancellor chandler applied entire fairness standard to a transaction in which Dairy Mart Convenience Stores, Inc., repurchased stock from its controlling shareholder and another large shareholder).

Indeed, the Delaware Supreme Court has spoken several times on the subject. For example, in *Kahn v. Tremont Corp. ("Tremont II")*, 694 A.2d 422 (Del. 1997), the Delaware Supreme Court affirmed the ruling in *Tremont I* that the entire fairness framework provided the operative standard of review for the asset transfer, holding that "when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard." *Id.* at 428. In *Levco Alternative Fund Ltd. v. Reader's Digest Association, Inc.*, 803 A.2d 428 (Del. 2002), the Delaware Supreme Court applied the entire fairness standard to a recapitalization in which a corporation repurchased shares from its controlling shareholder in return for a combination of cash and stock. Again, in *Nixon v. Blackwell,* 626 A.2d 1366 (Del. 1993), the Delaware Supreme Court applied the entire fairness standard to transactions that the controlling shareholders of E.C. Barton & Co. used to generate liquidity for themselves and other company employees. Further, in *Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403 (Del. 1988), the Delaware Supreme Court applied the entire fairness standard to series of transactions in which Trans World Airlines, Inc. purchased aircraft or leased planes from its controlling shareholder. Despite the overwhelming case law demonstrating that the entire fairness standard applies to any transaction in which the controlling shareholder stands on both sides of the transaction, Defendants falsely assert that, "more persuasive Delaware authorities hold that the entire fairness standard is inapplicable outside the context of squeeze out mergers involving a controlling shareholder, where, as here, a stockholder vote is not required." Defs' Br. at 20-21. In fact, the cases that Defendants' cite take the minority view and have been criticized at length by other Delaware Courts.[25]

---

[25] *See In re EZCORP Inc.*, 2016 Del. Ch. LEXIS 14, at *16-24 (Vice Chancellor Laster criticizes at length the same three cases that Defendants' reference in their motion papers, explaining that "[t]he defendants have found three rulings that did not apply the entire fairness framework to

### 2. The Entire Fairness Standard Applies To The Management Agreement At Issue Here

Delaware decisions have applied the entire fairness standard to compensation arrangements, consulting agreements and services contracts similar to the Management Agreement between NBC and CMA. In the *EZCORP* case, Vice Chancellor Laster applied the entire fairness standard to a consulting arrangement between a company owned by EZCORP's controlling shareholder and EZCORP which, like the Management Agreement in this case, allowed the controlling shareholder to reap proceeds of $5-$7 million. *See In re EZCORP Inc.*, 2016 Del. Ch. LEXIS 14, at *18. In the *T.Rowe Price* decision, Vice Chancellor Lamb applied the entire fairness standard to a services agreement producing proceeds of $3-$3.5 million, and rejected the argument that the business judgment rule applied because the contract was "not a merger but a business transaction." 770 A.2d at 550-51. Similarly, in *Carlson v. Hallihan*, 925 A.2d 506 (Del. Ch. 2006), Vice Chancellor Parsons utilized the entire fairness standard in evaluating (i) compensation paid to a corporation's controlling shareholder, who was also a director, (ii) management fees paid to affiliates of the controlling shareholder, and (iii) the failure to allocate expenses properly to affiliates of the controlling shareholder who received services from the corporation.

---

transactions through which a controller extracted a non-ratable benefit: *Dolan*, *Tyson*, and *Canal* . . . it appears to me that the weight of authority calls for applying the entire fairness framework more broadly and that the three cases are not persuasive"). Defendants also quote *In re MFW S'holders Litig.*, 67 A.3d 496, 526-27 (Del. Ch. 2013), a case involving a squeeze-out merger, for the proposition that the business judgment rule applies outside of the merger context when a transaction is approved by disinterested directors acting with due care. Not only is the quote from *MFW* pure dicta as it involves a squeeze-out merger not a services contract as the case is here, it also requires Defendants to prove that the directors were actually disinterested and acting with due care, which Defendants will not be able to do. *Id.*

Defendants seemingly claim the decades old Management Agreement must be fair because the Company has been highly successful.  To further this argument, Defendants claim the only choice faced by the Directors is to either continue the Agreement unchanged or to terminate it.  In fact, a third and more reasonable alternative would be the negotiation of an amended Agreement by a truly independent and disinterested Board or committee thereof.  The mere fact the Company has flourished over the past 28 years does not render the agreement entirely fair to minority shareholders.

### 3.    Defendants Will Be Unable To Demonstrate That The Management Agreement Is Fair

NBC does not disclose the full content of the Management Agreement to the investing public and its shareholders.  Plaintiff was only able to procure an unsigned "DRAFT" version of the Management Agreement through a FOIA request to the SEC.  ¶ 2 n.4.  The Management Agreement between NBC and CMA contains many patently unfair and onerous or illegal terms detrimental to NBC and its minority stockholders.  For example, the Management Agreement includes a provision related to "Standard of Care" that precludes liability by CMA or any of its employees acting on its behalf in connection with its duties and responsibilities under the Management Agreement "for any acts or omissions of any kind, unless caused by intentional misconduct of . . . [CMA] engaged in by . . . [CMA] in bad faith."  This provision violates Delaware law, which only permits exculpation clauses to apply to directors of the company.  *Gantler v. Stephens,* 965 A.2d 695, 709 n.37 (Del. 2009) ("Under 8 Del. C. § 102(b)(7), a corporation may adopt a provision in its certificate of incorporation exculpating its directors from monetary liability for an adjudicated breach of their duty of care.  Although legislatively possible, there currently is

no statutory provision authorizing comparable exculpation of corporate officers.").[26]  Contrary to Defendants arguments, whether it is legislatively possible at some time in the future for such a Standard of Care clause to become acceptable, such a term currently exceeds governing Delaware law and is unfair to minority shareholders.

The Management Agreement also has an onerous and unreasonable termination clause that provides for termination "upon one year prior written notice to the other party," while renewing automatically for additional one-year periods unless terminated.  This termination clause is especially unreasonable because it requires that NBC keep CMA as its management company, essentially running the company, for a year after being terminated.[27]  The Management Agreement also fails to adequately designate or identify the CMA personnel responsible for those duties provided to NBC in order to be able to determine whether NBC personnel are duplicating those duties.[28]

Moreover, contrary to Defendants' arguments, the well pled – and particularized – allegations of the Complaint demonstrate the Management Fee paid by NBC to CMA is excessive

---

[26] *See Frederick Hsu Living Tr. v. ODN Holding Corp.,* No. 12108-VCL, 2017 Del. Ch. LEXIS 67, at *93 (Ch. Apr. 14, 2017) ("The Complaint also supports a reasonable inference that Domeyer could be liable in her capacity as an officer, in which case she would not be entitled to exculpation.") (citing *Gantler,* 695 A.2d at 709 n.37.); *Amalgamated Bank v. Yahoo! Inc.,* 132 A.3d 752, 787 (Del. Ch. 2016) ("There is also the possibility of a claim against Mayer in her capacity as an officer.  Section 102(b)(7) does not authorize exculpation for officers."  (citing *Gantler*, 695 A.2d at 709 n.37.); *Chen v. Howard-Anderson,* 87 A.3d 648, 686 (Del. Ch. 2014) ("Seeley was not a director.  She served only in an officer capacity as the Company's CFO.  Section 102(b)(7) does not authorize exculpation for officers."); *In re Rural Metro Corp. Stockholders Litig.,* 88 A.3d 54, 86-87 (Del. Ch. 2014) ("The literal language of Section 102(b)(7) only covers directors; it does not extend to aiders and abettors . . . For similar textual reasons, the Delaware Supreme Court has noted that Section 102(b)(7) does not protect officers.") (citing *Gantler*, 695 A.2d at 709 n.37.).

[27] Defendants' citation to several cases concerning substantial severance payments is a red herring. It's not the amount of the severance payment that renders the termination clause onerous, it is the fact that CMA will continue to run the company for an entire year after being terminated.

26

and unreasonable.  Under the Management Agreement, CMA receives a management fee of 1% of NBC's net sales, defined as the total amount of sales less sales incentives, which amounted to $6,458,254 for 2015 and $7,047,850 for 2016.  This amounts to more than 10% of NBC's net profits for the same period.  The Management Agreement only incentivizes CMA to increase sales but not profit.  Furthermore, according to the Management Agreement, CMA will receive an additional ***undisclosed*** fee on top of the 1% of NBC's net revenues for "rendering advice and expertise in connection with a significant transaction."  The amount of such additional fee "will be negotiated on an individual basis by…[CMA] and the Board of Directors of the Company." This additional fee conflicts directly with the representations in the 2015-2017 Proxies that 1% paid to CMA includes compensation for "services in connection with acquisitions, dispositions and financings by the Company."

In sum, the Management Agreement is subject to the entire fairness standard.  Defendants therefore have the burden of proving that the Management Agreement meets the entire fairness threshold, not merely that the Company has been successful while it has been in place.  For the reasons discussed above, Defendants' will be unable to demonstrate that the Management Agreement meets the entire fairness threshold because of the many patently unfair and illegal terms.

E.      **The Complaint Properly States a Claim for Corporate Waste**

The essence of a claim for waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes.  *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979); *Combs v. PriceWaterhouse Coopers, LLP*, 382 F.3d 1196, 1200 (10th Cir. 2004) (holding that claims for corporate waste "must be brought as a derivative action").  Corporate waste "entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which

27

any reasonable person might be willing to trade." *Brehm*, 746 A.2d at 263.  Most often the claim is based on a transfer of corporate assets that serves no purpose for the corporation or for which no consideration is received.  *Id.*; *see also In re Sagent Tech., Inc., Derivative Litig.*, 278 F. Supp. 2d 1079, 1095 (N.D. Cal. 2003).

The Complaint alleges that N. Caporella, as the President of Broad River, used the Aircraft for personal travel at the Company's expense.  Just as with the Management Agreement, since N. Caporella stood on both sides of the transaction, controlling both NBC and Broad River to secure a personal benefit, the use of the Aircraft at Company expense must also be scrutinized under the entire fairness standard.  Defendants may be able to demonstrate in some fashion that such personal use provided a benefit to the corporation making it fair to minority shareholders.  A minority shareholder, however, is likely to consider that such an extravagance serves no purpose for the corporation or for which no consideration was received by the corporation.  Such an analysis, however is premature and should be left to a later stage of this proceeding.  *Shandler,* 2010 Del. Ch. LEXIS 154, at *43 n.108 (denying defendants' motion to dismiss, explaining that they could not "try the issue of fairness on a dismissal motion.").

Indeed, the reasonable inference to which Plaintiff is entitled, however, is that this practice continued throughout the Relevant Period – particularly in light of the fact Defendants never disclosed these flights or N. Caporella's interest in and control over Broad River.

Equally unavailing is Defendants' reliance upon *In re infoUSA, Inc. Shareholders Litigation*, 953 A.2d 963, 987 (Del. Ch. 2007) to argue that waste is only actionable if approved by the board.  *infoUSA* was decided in the demand futility context and merely held waste could not satisfy the second prong of the *Aronson* test without board approval.  *Id.* at 972.  Plaintiff, however, does not rely upon his waste claim for purposes of demand futility.

F.      **The Complaint Properly States a Claim for Violation of Section 14(a)**

Section 14(a) of the Exchange Act requires that proxy statements not be false or misleading with regard to any material statement, nor omit to state any material fact necessary in order to make the statements therein not false or misleading.  15 U.S.C. § 78n(a).  To state a claim for violation of Section 14(a) a plaintiff must allege that the defendant prepared a proxy statement containing a material misstatement or omission that caused the plaintiff's injury.  *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1290 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010).  "The plaintiff must allege that 'the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'"  *Id.*  Although not requiring scienter, a Section 14(a) claim requires an allegation that the defendant negligently drafted the proxy statement.  *Id.*  Moreover, even if the PSLRA applies to Plaintiff's Section 14(a) claims, the required state of mind for a Section 14(a) claim is negligence, however, not knowledge or deliberate recklessness.  Therefore, even under the PSLRA, a plaintiff need only plead particularized facts that give rise to a strong inference of negligence.  *Hutton v. McDaniel*, No. CV-17-00727-PHX-JAT, 2017 U.S. Dist. LEXIS 137869, at *33 (D. Az. Aug. 28, 2017).  The well pled allegations of the Complaint satisfy each of these elements.

As detailed above, the 2015-2017 Proxies failed to disclose that (i) N. Caporella, J. Caporella and Bracken were or are affiliated with Broad River; (ii) that Broad River is the predominant owner of the Aircraft; and (iii) that certain of the Individual Defendants (including, but not limited to, N. Caporella) utilized the Aircraft for personal trips.  ¶ 123.  The 2015-2017 Proxies also failed to disclose the other material terms specified above in connection the Management Agreement, most notably, additional fees to be earned by CMA concerning

significant transactions, which is directly contrary to the representations as set forth in the 2015-2017 Proxies.  ¶ 124.

Defendants claim that Plaintiff is attempting to create a "freestanding completeness requirement."  Defs' Brf. at 25.  Quite the contrary, Defendants chose to speak on each of these topics in the 2015-2017 Proxies and consequently, they had a duty to not omit any material facts necessary in order to make the statements therein not false or misleading.  15 U.S.C. § 78n(a).

### 1. False Statements Regarding the Aircraft

Defendants chose to claim in the 2015-2017 Proxies that the only perquisite provided to its employees (beyond health, retirement and insurance benefits) is a car allowance.  Nevertheless, N. Caporella used the Aircraft for personal trips at NBC expense.  ¶¶ 8, 77-80, 85 (identifying specific flights).  Plaintiff does not claim that Defendants had an obligation to disclose this freebie under Item 402 of Regulation S-K relating to executive compensation (17 C.F.R. § 229.402), as Defendants would suggest.  Rather, when Defendants chose to disclose employee perquisites, they were not allowed to pick and choose which ones were disclosed.  This omission was exacerbated by Defendants' failure to disclose that Broad River was the majority owner of the Aircraft and that N. Caporella and J. Caporella controlled Broad River.

### 2. False Statements Related to the Management Agreement

Similarly, Defendants chose to state affirmatively that the 1% Management Fee paid to CMA included "services in connection with acquisitions, dispositions and financings by the Company."  ¶ 42.  This statement was false because the Agreement expressly states that these services entitled CMA to additional fees to be negotiated.  Complaint Ex. A.  According to the Agreement, CMA will receive an additional fee on top of the 1% of NBC's net revenues for "rendering advice and expertise in connection with a significant transaction."  The amount of such additional fee "will be negotiated on an individual basis by . . . [CMA] and the Board of Directors

of the Company."   There is no question that the Individual Defendants, especially those on the Board, knew what the CMA Agreement stated and that it contained provisions contrary to what was in the 2015-2017 Proxies.

### 3.     Plaintiff Has Alleged Loss Causation

Contrary to Defendants' arguments, Plaintiff has alleged loss causation.   Courts have recognized that a complaint properly alleges loss causation, i.e., that the "that the transactions approved by shareholders harmed the company," where the false and misleading Proxy resulted in the approval of incentive compensation (*In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541-JST, 2017 U.S. Dist. LEXIS 164824, at*63 (N.D. Cal. Oct. 4, 2017)) or where directors were elected based upon false and misleading financial information.  *See Countrywide*, 554 F. Supp. 2d at 1077 ("Shareholders would reasonably consider the Company's financial performance in deciding whether to reelect the directors.").

In the present case, Plaintiff does not allege that the 2015-2017 Proxies failed to disclose mere mismanagement or the failure to follow company policies as in *In re Home Depot Shareholder Derivative Litigation*, 223 F. Supp. 3d 1317, 1331 (N.D. Ga. 2016) and *General Electric Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992), both of which were cited by Defendants.  Rather, as in *Wells Fargo* and *Countrywide*, the Complaint alleges that Defendants failed to disclose material facts pertaining to the perquisites and the additional compensation under the Management Agreement – both provided directly or indirectly to the controlling shareholder.

Equally ludicrous is Defendants' arguments that the false and misleading 2015-2017 Proxies could not have caused damage to minority shareholders since N. Caporella has sufficient shareholdings to elect his chosen slate of directors regardless of the Proxy.  Section 14(a)'s prohibition on false and misleading proxy statements is even more crucial in the presence of a controlling shareholder.

31

**4.      The Complaint Alleges Facts Giving Rise to a Strong Inference of Negligence.**

Even if the PSLRA is applied to Section 14(a) claims, as discussed above, the Complaint need only allege facts which give rise to a strong inference of negligence, not scienter.  *Hutton*, 2017 U.S. Dist. LEXIS 137869, at *33.  N. Caporella and J. Caporella were officers and directors of NBC and controlled Broad River.  Conlee, Hathorn and Sheridan were Directors and members of the Audit Committee.  Based upon the positions of the Defendants and their attendance at Board and Audit Committee meetings, the only reasonable inference that can be drawn is that Defendants were, at a minimum, negligent to not know the false and misleading nature of their statements (1) that a car allowance was the only perquisite given to N. Caporella; or (2) that CMA's service for significant transactions was included in the 1% Management Fee.

## CONCLUSION

For each of the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: January 8, 2018                                   Respectfully submitted,

                                                         /s/ Christopher S. Polaszek
                                                         Chirstopher S. Polaszek
                                                         Florida Bar No. 0116866
                                                         **THE POLASZEK LAW FIRM, PLLC**
                                                         3407 W. Kennedy Blvd.
                                                         Tampa, FL 33606
                                                         Telephone: (813) 574-7678
                                                         Email: chris@polaszeklaw.com

                                                         Stuart J. Guber (admitted *pro hac vice*)
                                                         **FARUQI & FARUQI, LLP**
                                                         101 Greenwood Avenue, Suite 600
                                                         Jenkintown, PA 19046
                                                         Telephone: 215-277-5770
                                                         Facsimile:  215-277-5771

Nina M. Varindani (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile:  212-983-9331

*Attorneys for Plaintiff*

33

## **REQUEST FOR HEARING**

Plaintiff respectfully requests a hearing because they believe it may assist the Court in addressing the issues involved in this shareholder derivative action.  Thus, pursuant to Local Rule 7.1(b)(2), Plaintiff requests a hearing consisting of twenty (20) minutes per side, with an additional five (5) minutes for rebuttal.

Dated: January 8, 2018                                 Respectfully submitted,

                                                               /s/ Christopher S. Polaszek
                                                               Christopher S. Polaszek, Esq.

                                                               *Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing and the following was electronically field through the Electronic Case Filing System (CM/ECF) and served by Notice of Electronic Filing generated by CM/ECF, on January 8, 2018, on all counsel or parties of record on the Service List below.

Dated: January 8, 2018                                    Respectfully submitted,

                                                          /s/ Christopher S. Polaszek
                                                          Christopher S. Polaszek, Esq.

                                                          *Attorney for Plaintiffs*

## SERVICE LIST

Daniel A. Casey
Stephen McGuinness
**K&L Gates LLP**
200 South Biscayne Boulevard, Suite 3900
Miami, FL 33131-2399
Email: daniel.casey@klgates.com
Email: stephen.mcguinness@klgates.com

Nicholas G. Terris
Amy J. Eldridge
Curtis S. Kowalk
**K&L Gates LLP**
1601 K Street NW
Washington, DC 20006
Email: nicholas.terris@klgates.com
Email: amy.eldridge@klgates.com
Email: curtis.kowalk@klgates.com