# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No.  17-cv-61535-BB

ANGUS MCDOWELL,

      Plaintiff,

v.

GEORGE R. BRACKEN, et al.,

      Defendants.

_____/

## ORDER ON DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendants' Motion to Dismiss Plaintiff's Verified Shareholder Derivative Complaint (the "Motion").  *See* ECF No. [25].  The Court has reviewed the Motion, all supporting and opposing submissions, the record and applicable law, and is otherwise fully advised.  For the reasons that follow, Defendants' Motion is granted.

## I.      BACKGROUND

Plaintiff brings the present action derivatively and on behalf of National Beverage Corp. ("NBC"), a Delaware corporation with its principal place of business in Fort Lauderdale, Florida.[1]  *See* ECF No. [1], at ¶ 1.  "Through its subsidiaries, NBC develops, produces and distributes a portfolio of beverage brands that are sold and distributed in the United States and abroad."  *Id.*  The action is brought against NBC's board of directors, certain executive officers, and related entities for purported violations of Delaware law and Section 14(a) of the Securities and Exchange Act, 15 U.S.C. § 78a *et seq.*, during fiscal years 2015–2017 through the present (the "Relevant Period").  *See Id.*  To better understand the nature of the allegations, a quick summary of the ten defendants is provided below:

---

[1] Plaintiff is a stockholder of NBC.  *See* ECF No. [1], at ¶ 15.

(1) N. Caporella founded NBC in 1985. *See Id.* at ¶ 3. He is NBC's Chief Executive Officer, the Chairman of the board of directors, and the beneficial owner of 73.6 percent of NBC's outstanding common stock as of August 8, 2016.[2] *See Id.* at ¶ 1.

(2) Bracken is NBC's Executive Vice President of Finance. *See Id.* at ¶ 22.

(3) Cook is the Vice President – Controller and Chief Accounting Officer of NBC. *See Id.* at ¶ 24.

(4) J. Caporella is N. Caporella's son, President of NBC since 2002, and member of the board since 1987. *See Id.* at ¶ 21.

(5) Conlee has served on the NBC board since 2009. *See Id.* at ¶ 23. He has served as Chairman of NBC's Compensation and Stock Option Committee, and has been a member of the Audit Committee and Strategic Planning Committee during the Relevant Period. *See Id.*

(6) Hathorn has been on NBC's board since 1997. *See Id.* at ¶ 25. He previously served on the board from 1985 through 1993 prior to returning. *See Id.* Throughout the Relevant Period, Hathorn has served as Chairman of the Audit Committee, Deputy Chairman of the Compensation and Stock Option Committee and Nominating Committee, and has been a member of the Strategic Planning Committee. *See Id.*

(7) Sheridan has served on the NBC board since 2009, serving as Deputy Chairman of the Audit Committee and as a member of the Compensation and Stock Option Committee and Nominating Committee during the Relevant Period. *See Id.* at ¶ 26.

---

[2] N. Caporella owns 71.5 percent of NBC's outstanding common stock through Defendant IBS Partners Ltd. *See* ECF No. [1], at ¶ 18. IBS Partners Ltd. is a Texas limited partnership whose sole general partner is Defendant IBS Management Partners, Inc., a Texas corporation wholly-owned by N. Caporella. *See Id.* at ¶¶ 18–19.

(8) Corporate Manager Advisors, Inc. ("CMA") is a Delaware corporation wholly-owned by N. Caporella, with its principal place of business in Fort Lauderdale, Florida. *See Id.* at ¶ 17. N. Caporella is the President of CMA, while Bracken is the Vice President. *See Id.* Pursuant to a management agreement (the "Agreement") between NBC and CMA, CMA provides the services of NBC's CEO and Chief Financial Officer (that is, N. Caporella and Bracken), as well as the services of other "unnamed senior and corporate personnel, who purportedly provide management, administrative, and creative functions" to NBC under the Agreement.[3] *See Id.* at ¶ 2.

Many, if not all, of Plaintiff's allegations stem from alleged omissions or inconsistencies between the provisions of the Agreement and NBC's filings with the Securities and Exchange Commission ("SEC") during the Relevant Period. For instance, under the Agreement, CMA provides its management services and other functions to NBC for an annual fee of 1 percent of NBC's net sales. *See Id.* at ¶ 41. However, the proxy statements filed with the SEC during the Relevant Period state that CMA is "entitled to a fee for rendering advice and expertise in connection with significant transactions up and above the 1% of net revenues management fee." *See Id.* at ¶ 89.

Moreover, Plaintiff alleges that the Agreement duplicates various responsibilities and functions between NBC and CMA—including administrative, sales, marketing, and legal services—for which NBC employees are already being compensated. *See Id.* at ¶¶ 45–68. Plaintiff further alleges that the Agreement contains a Standard of Care provision[4] that violates

---

[3] NBC and CMA first entered into the Agreement in 1991. *See* ECF No. [1], at ¶ 40.
[4] "The Manager [CMA] (including any person or entity acting for or on behalf of the Manager) shall not be liable for any mistakes of fact or errors of judgment, for losses sustained by the Company [NBC] or any subsidiary or for any acts or omissions of any kind, unless caused by intentional misconduct of the Manager engaged in by the Manager in bad faith." *See* ECF No. [1], at ¶ 71.

Delaware law because it "permit[s] officers to be shielded from liability under Delaware's exculpatory [statutory] provision, which applies only to directors." *See Id.* at ¶ 72. The Agreement also contains an "unreasonable" termination clause that requires one year's written notice to either NBC or CMA to terminate the Agreement, yet provides for an automatic one-year renewal if not terminated. *See Id.* at ¶ 73. According to Plaintiff, the NBC board has continued to approve the Agreement during the Relevant Period despite these "invalid" and "onerous" provisions.

Within the proxy statements filed with the SEC during the Relevant Period, NBC stated that the only perquisite received by its employees beyond retirement, health, and insurance benefits, was a car allowance. *See Id.* at ¶ 83. Nevertheless, Plaintiff alleges that NBC paid for N. Caporella's personal use of an aircraft partly owned by NBC while failing to disclose this use in the company's proxy statements.[5] *See Id.* at ¶¶ 84, 87.

As a result of these allegedly false acts, statements, and omissions, Plaintiff filed the present action against Defendants on behalf of NBC, bringing forth claims for breach of fiduciary duty (Count I) and corporate waste (Count II) under Delaware law, and violations of Section 14(a) of the Securities and Exchange Act (Count III) in connection with the proxy statements filed during the Relevant Period. *See Id.* at 44–47. On November 20, 2017, Defendants filed the Motion. *See* ECF No. [25]. Plaintiff timely filed his response, ECF No. [36], and Defendants timely filed their reply, ECF No. [37]. On May 15, 2018, the Court held a hearing on the Motion. *See* ECF Nos. [42]–[43]. The Motion is ripe for adjudication.

---

[5] The proxy statements also allegedly failed to include complete and accurate information regarding the ownership of the aircraft. *See* ECF No. [1], at ¶ 87. Specifically, the proxies only mentioned that NBC was a 20 percent owner of the aircraft, yet failed to indicate that the rest of the aircraft was owned by Broad River Aviation, Inc., a company managed by N. Caporella and Bracken (and previously managed by J. Caporella). *See Id.* at ¶ 7.

## II.     LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557 (alteration in original)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6), which requests dismissal for "failure to state a claim upon which relief can be granted."

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful

conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (*quoting Iqbal*, 556 U.S. at 682).

A court considering a Rule 12(b)(6) motion is generally limited to the facts contained in the complaint and the attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (*citing Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)). "[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007). It is through this lens that the Court addresses the instant Motion.

## III. DISCUSSION

Defendants have moved to dismiss all of Plaintiff's claims against them. As the primary basis for dismissal, Defendants assert that Plaintiff has not met the heightened pleading standards that govern derivative suits in Delaware. In the alternative, Defendants also allege that Plaintiff has failed to state his claims as a matter of law. The Court will first address Plaintiff's claims arising under Delaware law, and will then discuss Plaintiff's federal claim against Defendants.

### A. Demand Futility under Delaware law.

It is undisputed that both of Plaintiff's claims for breach of fiduciary duty and for corporate waste are subject to Delaware's Court of Chancery Rule 23.1. "Because the shareholders' ability to institute an action on behalf of the corporation inherently impinges upon the directors' power to manage the affairs of the corporation[,] the law imposes certain prerequisites on a stockholder's right to sue derivatively." *Kaplan v. Peat, Marwick, Mitchell &*

*Co.*, 540 A.2d 726, 730 (Del. 1988). Under Rule 23.1, stockholders may "initiate a derivative suit to enforce unasserted rights of the corporation without the board's approval where they can show either that the board wrongfully refused the plaintiff's pre-suit demand to initiate the suit or, if no demand was made, that such a demand would be a futile gesture and is therefore excused." *White v. Panic*, 783 A.2d 543, 550 (Del. 2001). "Where, as in this case, a stockholder plaintiff initiates a derivative action without making a pre-suit demand on the board, Rule 23.1 requires that the complaint allege with particularity the reasons for the plaintiff's failure to demand action from the board." *Id.* at 550–51; *see also* Ct. Ch. Rule 23.1(a) ("The complaint shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort.").

In *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), the Supreme Court of Delaware held that a demand on the board is excused only if the complaint contains particularized factual allegations raising a reasonable doubt that either: "(1) the directors are disinterested and independent" or "(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." At the motion to dismiss stage, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000). As will be explained in further detail below, Plaintiff has not made the requisite showing under *Aronson* to excuse pre-suit demand on the NBC board.[6]

### 1. Director Independence.

The directors of the NBC board during the Relevant Period are N. Caporella, J. Caporella, Conlee, Hathorn, and Sheridan. "To establish demand futility under *Aronson* . . .

---

[6] The parties agree that *Aronson* controls the Court's demand futility analysis.

Plaintiff must impugn the ability of at least half of the directors in office when it initiated this action . . . to have considered a demand impartially." *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015).

At the hearing, Plaintiff admitted that he should have filed an amended complaint rather than make arguments for the first time in his response to the Motion that Conlee, Hathorn, and Sheridan were not disinterested due to their compensation and stock options. Nevertheless, when specifically asked by the Court, Plaintiff stated that there were no other facts he would have used or included in an amended complaint to support his demand futility allegations, and, as such, all the facts in support of those allegations were before the Court. The Court also notes that Plaintiff had ample time and opportunity to file an amended complaint, yet did not do so.[7] *See Delaware Cty. Employees Ret. Fund v. Sanchez*, 124 A.3d 1017, 1021 n.14 (Del. 2015) ("[W]e note that the proper way for the plaintiffs to have used these materials is by seeking to amend their complaint. It is not fair to the defendants, to the Court of Chancery, or to this Court, nor is it proper under the rules of either court, for the plaintiffs to put facts outside the complaint before us. Perhaps as important for stockholder plaintiffs themselves, this approach hazards dismissal with prejudice on the basis of a record the plaintiffs had the fair chance to shape and that omitted facts they could have, but failed to, plead.").

---

[7] For instance, the Complaint was filed on August 2, 2017, *see* ECF No. [1], and due to an extended briefing schedule requested by the parties and granted by the Court, *see* ECF Nos. [8]–[9], the Motion was filed on November 20, 2017, the response was filed on January 8, 2018, and the reply was filed on January 29, 2018, *see* ECF Nos. [25], [36], [27]. Plaintiff also admitted on the record that he did not avail himself of Del. Code Ann. tit. 8, § 220, which allows stockholders to inspect a corporation's books and records. *See White v. Panic*, 783 A.2d 543, 557 n. 15 (Del. 2001) ("We have emphasized on several occasions that stockholder '[p]laintiffs may well have the "tools at hand" to develop the necessary facts for pleading purposes,' including the inspection of the corporation's books and records under 8 Del. C. § 220."); *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1057 n. 52 (Del. 2004) ("[W]e approved the Vice Chancellor's admonition in that case that a plaintiff should pursue a books and records inspection in order to secure the facts necessary to support an allegation of demand futility if the factual allegations would otherwise fall short.").

Plaintiff has not alleged that any of the directors apart from N. Caporella are "interested" in the Agreement or any of the transactions at issue.[8]  Nevertheless, the parties seem to agree that neither N. Caporella (in light of his substantial financial and personal interest in the company) nor J. Caporella (as N. Caporella's son) are disinterested or independent for purposes of the demand futility analysis.  Instead, the parties contest the independence of Conlee, Hathorn, and Sheridan from NBC's founder, CEO, Chairman, and controlling shareholder, N. Caporella.  If Plaintiff's particularized factual allegations support a showing that at least one of the remaining directors lacks independence, pre-suit demand on the board would be excused.

In the demand futility context, directors are "presumed to be independent." *Id*. at 59. Under Delaware law, "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Id*. "[A] lack of independence can be shown by pleading facts that support a reasonable inference that the director is beholden to a controlling person or 'so under their influence that their discretion would be sterilized.'" *Id*. (*quoting Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)). Thus, a non-interested director is not independent if particularized allegations support the inference that he or she "would be more willing to risk his or her reputation than risk the relationship with the interested [person]." *Id*.

Plaintiff contends that Conlee, Hathorn, and Sheridan are "incapable of making an impartial decision to . . . vigorously prosecute" this action as a result of their "longstanding professional relationships" with N. Caporella.  ECF No. [1], at ¶ 108.  In particular:

---

[8] A director is interested in a transaction if "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or if "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."  *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

(1) Conlee served for more than 20 years as lead director of Burnup & Sims, Inc., where N. Caporella was President and CEO from 1976 to 1994, and Chairman from 1979 to 1994. *See Id*. at ¶¶ 20, 108.

(2) Hathorn served as a director of Burnup & Sims, Inc., from 1981 to 1997, while also serving on NBC's board during its "formative years," 1985 to 1993. *See Id*. at ¶ 108.

(3) Sheridan was employed by Faygo Beverages, Inc., a wholly-owned subsidiary of NBC since 1987, from 1974 until his retirement in 2004. *See Id*. at ¶¶ 26, 108. Sheridan joined Faygo Beverages, Inc., in 1974 as Chief Financial Officer and was promoted to President in 1987 when the company was acquired by NBC. *See Id*.

"Further, . . . Conlee, Hathorn and Sheridan are beholden to N. Caporella, as they are dependent on him for their position as NBC directors. The combination of their reliance on N. Caporella, as well as their longstanding professional relationship with him, render . . . Conlee, Hathorn and Sheridan incapable of objectively and fairly evaluating a demand by Plaintiff." *See Id*. at ¶ 109.

These allegations are not sufficient to satisfy *Aronson*'s first prong, as Delaware courts have dismissed derivative complaints containing allegations that are more particularized than those presented by Plaintiff in this case. For instance, in *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040 (Del. 2004), a shareholder brought a derivative action claiming that the board of directors lacked independence for purposes of considering a pre-suit demand from the company's controlling shareholder, Martha Stewart. At issue on appeal was the independence of three directors. The first director, Arthur C. Martinez, had served on the board of the company since 2001, had previously established a relationship with the company while an officer and director of Sears, had been recruited to the board of the company by Stewart's longtime personal friend, Charlotte Beers, and was himself a

"longstanding personal friend" of Stewart and another director named Sharon L. Patrick, who stated in a 2001 article that "[Martinez] is an old friend to both me and Martha." *Id*. at 1045. The second director, Darla D. Moore, had also served on the board of the company since 2001 and was "a longstanding friend" of Stewart, having attended a wedding reception in 1995 that was hosted by Stewart's personal lawyer and in which Stewart was also in attendance. *See Id*. In 1996, moreover, Fortune magazine printed an article highlighting Moore's "close personal relationship" with Stewart and Beers, whom Moore replaced when Beers resigned from the company's board. *See Id*. Finally, director Naomi O. Seligman was alleged to have been a director since 1999 and, according to a 2002 story that appeared in the Wall Street Journal, contacted the CEO of a publishing house (where Seligman was also a director) at the behest of Stewart "to express concern over its planned publication of a biography that was critical of Stewart." *Id*. at 1045–46.

The Supreme Court of Delaware, however, held that even though the shareholder "attempted to plead affinity beyond mere friendship between Stewart and the other directors, . . . her attempt [was] not sufficient to demonstrate demand futility." *Id*. at 1051. This is because:

> Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as "friends," even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence. They do not provide a sufficient basis from which reasonably to infer that Martinez, Moore and Seligman may have been beholden to Stewart. Whether they arise before board membership or later as a result of collegial relationships among the board of directors, such affinities—standing alone—will not render presuit demand futile.

*Id*. In the present case, Plaintiff has not even alleged that Conlee, Hathorn, or Sheridan shared "a particularly close or intimate personal" affinity with N. Caporella. *Id*. Nor has Plaintiff provided

any "evidence that in the past the relationship caused the director[s] to act non-independently vis a vis an interested director." *Id.*

Instead, Plaintiff's allegations—which are limited to the business relationships between N. Caporella and the three directors—"largely boil down to a 'structural bias' argument, which presupposes that the professional and social relationships that naturally develop among members of a board impede independent decisionmaking." *Id.* at 1050–51. As the Delaware Supreme Court stated in *Aronson*, 473 A.2d at 815 n.8, however, "[t]he difficulty with structural bias in a demand futile case is simply one of establishing it in the complaint for purposes of Rule 23.1. We are satisfied that . . . review by the Court . . . of complaints alleging specific facts pointing to bias on a particular board will be sufficient for determining demand futility." No such allegations are present in this case.

In his response to the Motion, Plaintiff states that the Court "should draw the inference that long-standing ties across two companies existed between N. Caporella and Conlee extending back approximately 40 years, Hathorn [and Sheridan] extending back over 30 years," and that these ties should put the directors' independence in doubt. ECF No. [36], at 17. It is true that "it may be possible to plead additional facts concerning the length, nature or extent of . . . previous relationships that would put in issue that director's ability to objectively consider the challenged transaction." *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002). Nevertheless, "the Court cannot make a *reasonable* inference that a particular [relationship is of a bias-producing nature] without specific factual allegations to support such a conclusion." *Beam*, 845 A.2d at 1050 (emphasis in original). Here, Plaintiff has simply alleged that N. Caporella and the three directors have served on the board of two companies for a long time. These allegations, absent

more particularized facts regarding "the nature of the relationship or additional circumstances," *Id*. at 1052, are not sufficient to demonstrate demand futility.[9]

Delaware law is clear that "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Id*. at 1050. Plaintiff's allegations surrounding the business relationships between N. Caporella and the three directors as a result of their service on the board of a couple of companies over a long span of time do not create a reasonable doubt that either Conlee, Hathorn, or Sheridan would risk their reputation at the expense of jeopardizing their relationship with N. Caporella.[10]

### 2. Valid exercise of business judgment.

Plaintiff can still excuse pre-suit demand upon the NBC board if he can show that the Agreement and the other transactions at issue were not the result of a valid exercise of business

---

[9] *See, e.g.*, *Crescent/Mach I Partners, L.P. v. Turner*, Del.Ch., C.A. No. 17455, mem. op. at 30, Steele, V.C., 2000 WL 1481002 (by designation) (Sept. 29, 2000) (holding that allegations of a "long-standing 15–year professional and personal relationship" between a director and the CEO and Chairman of the Board of his company were insufficient to support a finding of control); *State of Wisconsin Inv. Bd. v. Bartlett*, Del.Ch., C.A. No. 17727, mem. op. at 17, Steele, V.C., 2000 WL 238026 (Feb. 24, 2000) (stating that "[e]vidence of personal and/or past business relationships does not raise an inference of self-interest"); *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 355 (Del. Ch. 1998), *aff'd in part, rev'd in part and remanded sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("The fact that [the Chairman/CEO] has long-standing personal and business ties to [the employee] cannot overcome the presumption of independence that all directors . . . are afforded."). Plaintiff's principal case demonstrates the insufficiency of Plaintiff's allegations. *See Delaware Cty. Employees Ret. Fund v. Sanchez*, 124 A.3d 1017, 1021 (Del. 2015) ("[P]laintiffs . . . pled facts support[ing] an inference that Jackson cannot act independently of Chairman Sanchez, because he is Sanchez's close friend of a half century, derives his primary employment from a company over which Sanchez has substantial control, [and] has a brother in the same position . . . .").

[10] That N. Caporella is a controlling shareholder does not affect the demand futility analysis. *See Teamsters*, 119. A.3d at 67 ("As *Aronson*, *Beam*, and Rule 23.1 make plain . . . . neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry.").

judgment.[11]  "The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors . . . .  It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.  Absent an abuse of discretion, that judgment will be respected by the courts.  The burden is on the party challenging the decision to establish facts rebutting the presumption."  *Aronson*, 473 A.2d at 812 (internal citations omitted).  Under the business judgment rule, "director liability is predicated upon concepts of gross negligence."  *Id.*

### a.  Breach of fiduciary duty.

In Count I, Plaintiff claims that Defendants breached their fiduciary duties by: (1) allowing for materially inadequate controls over NBC's policies and practices as evidenced by the lack of definition and duplication of functions between employees of NBC and CMA; (2) approving the Agreement every year during the Relevant Period even though it contains the illegal Standard of Care provision, one year termination clause, and potential additional fees to be earned by CMA in connection with significant transactions; and (3) allowing NBC to file false and misleading periodic reports such as the 2015–17 proxy statements with the SEC in violation of federal regulations.  *See* ECF No. [1], at ¶ 112.  As will be explained below, Plaintiff must show that directors Conlee, Hathorn, and Sheridan acted in bad faith when both approving the Agreement (allegation two) and in failing to provide the proper oversight (allegations one and three).  This is a high standard, and one that Plaintiff has failed to meet.

---

[11] Although the parties spent much time in theirs briefs arguing whether the "entire fairness" rule applies to the second prong of *Aronson* due to N. Caporella's status as a controlling shareholder, Plaintiff conceded at the hearing that the business judgment rule was applicable at this demand futility stage.

The Delaware Court of Chancery's decision in *Caremark*[12] articulates the necessary conditions "where directors are alleged to be liable for a failure to monitor liability creating activities," as in Plaintiff's first and third allegations outlined above. *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009). To prove director oversight liability, a plaintiff must demonstrate:

> (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith. Thus, to establish oversight liability a plaintiff must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act. The test is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability.

*Id.* (internal citations omitted) (emphasis in original). Plaintiff's allegations again fall short. For instance, regarding Plaintiff's contention that the directors allowed for materially inadequate controls over NBC's policies and practices as evidenced by the lack of definition and duplication of functions between employees of NBC and CMA, Plaintiff has not provided the Court with any information about the "internal controls" (or lack thereof) that led to the supposed duplication of services. Nor has Plaintiff alleged with particularity which employees are being compensated for performing these duplicated functions,[13] or, importantly, that the directors *knew* that particular

---

[12] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996). In *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 364 (Del. 2006), the Delaware Supreme Court approved of the *Caremark* standard.

[13] Indeed, Plaintiff has alleged that employees are "presumably" being compensated for "duplicating responsibilities." ECF No. [1], at ¶ 70. Moreover, many of the allegations supporting Plaintiff's argument concerning the duplication of services predate the Relevant Period, so they do not aid the Court in determining whether these "overlaps" in responsibility are ongoing. *See*, *e.g.*, *Id.* at ¶¶ 50–51, 61, 63.

functions were being replicated yet continued to allow corporate assets to be wasted. Finally, even if the Court were to accept that services and functions are being replicated, the Complaint fails to allege the nature, quality, duration, or financial terms of the services being provided by CMA to allow the Court to make a meaningful comparison of what the services are worth relative to the price NBC has paid for them. Without these particular facts, which Plaintiff admitted at the hearing he is not in possession of, the Court cannot infer "that the . . . Agreement [or duplication of services] was 'so far beyond the bounds of reasonable judgment' as to constitute bad faith or to demonstrate that the [directors] put the interests of [N. Caporella] ahead of the best interests of the Company." *Teamsters*, 119 A.3d at 64.

Plaintiff's *Caremark* claim pertaining to the filing of false and misleading periodic reports, such as the 2015–17 proxy statements, with the SEC in violation of federal regulations is similarly deficient. First, Plaintiff admitted in the hearing that there is no evidence that the directors knew or authorized N. Caporella's personal use of the aircraft.[14] Moreover, "[i]t is unclear from [the] allegations how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand on the board of directors would have been excused as futile." *Citigroup*, 964 A.2d at 133 n.88. Plaintiff has failed to provide specific factual allegations to allow the Court to determine the degree of involvement of Conlee, Hathorn, and Sheridan in the preparation of the proxy statements: as such, the Complaint fails to adequately plead facts reasonably suggesting that the three directors "allowed" for the filing of the proxy statements with knowledge that they were false, misleading, or in bad faith.

---

[14] Plaintiff has alleged that the proxy statements contained false statements and omitted material facts regarding NBC's employee perquisites and N. Caporella's use of the aircraft. *See* ECF No. [1], at ¶ 88.

"In the absence of red flags, good faith in the context of oversight must be measured by the directors' actions 'to assure a reasonable information and reporting system exists' and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome." *Stone*, 911 A.2d at 373 (*quoting Caremark*, 698 A.2d 967–68, 971). Plaintiff has not provided the Court with particularized factual allegations regarding the directors' implementation or monitoring of NBC's internal controls, let alone that the directors knew they were not discharging their fiduciary obligations or that the directors demonstrated a conscious disregard for their responsibilities. Plaintiff's director oversight liability claims under *Caremark* thus fail.

Plaintiff has also alleged that Defendants breached their fiduciary duties to NBC by approving the Agreement every year during the Relevant Period despite the Agreement containing the illegal Standard of Care provision, one year termination clause, and potential additional fees to be earned by CMA in connection with significant transactions. In *Aronson*, 473 A.2d at 815, the Supreme Court of Delaware made clear that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." In situations where, as here, a corporation's charter includes an exculpatory provision pursuant to 8 Del C. § 102(b)(7), *see* ECF No. [25–7], at 24 (Eighth Article), a substantial likelihood of liability "may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (emphasis in original); *see also In re Baxter Int'l, Inc. Shareholders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995) ("When the

certificate of incorporation exempts directors from liability, the risk of liability does not disable

them from considering a demand fairly unless particularized pleading permits the court to

conclude that there is a substantial likelihood that their conduct falls outside the exemption.").

The exculpatory provision in NBC's charter does not eliminate or limit director liability:

> (i) for any breach of the director's duty of loyalty . . . (ii) for act or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, (iv) for any transaction from which the director derived an improper personal benefit, or (v) for any act or omission occurring prior to the date when the provision becomes effective.

ECF No. [25–7], at 24 (Eighth Article).[15] "Because the duty of loyalty mandates that the best

interest of the corporation and its shareholders takes precedence over any interest possessed by a

director, officer or controlling shareholder and not shared by the stockholders generally, a

plaintiff can show a lack of good faith by establishing that a director failed to pursue the best

interests of the corporation and its stockholders." *Teamsters*, 119 A.3d at 63 (internal citations

and quotations omitted). A plaintiff, moreover, may show a lack of good faith by establishing

that a director's decision was "so far beyond the bounds of reasonable judgment that it seems

essentially inexplicable on any ground other than bad faith." *In re J.P. Stevens & Co., Inc.*

*Shareholders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988). "This is a high pleading standard, as

Delaware courts typically frame a lack of good faith in terms of 'intentional' misconduct."

*Teamsters*, 119 A.3d at 63.[16]

---

[15] Only violations of subsections (i) and (ii) seem to be in question, as Plaintiff has not: mentioned Section 174 of the General Corporation Law of the State of Delaware anywhere in the Complaint; alleged that Conlee, Hathorn, or Sheridan derived personal benefits from the Agreement or the provisions at issue; or claimed that any acts or omissions occurred prior to the date the charter's exculpatory provision became effective.

[16] Furthermore, in *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008), the Delaware Supreme Court stated that when "directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally

Plaintiff has not met this high burden. Specifically, Plaintiff has not pled with particularity that the NBC board engaged in bad faith or intentional misconduct when they approved the Agreement's provisions. For instance, Plaintiff has not pointed the Court to any authority stating that there is anything wrong or improper (let alone illegal) with the Agreement's "onerous" one-year termination provision. Similarly, regarding the additional fees that CMA can potentially earn in connection with significant transactions, Plaintiff has not provided the Court with any specific financial information regarding the amount of fees CMA can earn or has earned for these "significant transactions." As a result, the Court cannot determine that the provision for additional fees is "so facially unfair as to constitute a lack of good faith" by the directors. *See Teamsters*, 119 A.3d at 64.

Plaintiff contends that the Standard of Care provision is illegal because it purports to exculpate NBC's officers when Delaware law only allows for the exculpation of directors in the corporate charter. Even disregarding the fact that the exculpatory provision in the Agreement is a *contractual* clause limiting liability (rather than an exculpatory provision in the charter) that is qualified by another clause in the Agreement stating that "each term . . . shall be valid and be enforced to the fullest extent permitted by law," the deficiency of Plaintiff's claim here is more basic. The Complaint does not allege that the directors had actual or even constructive knowledge that the Standard of Care provision was illegal, yet they included it anyway. *See Solak v. Sarowitz*, 153 A.3d 729, 745 (Del. Ch. 2016), *appeal refused sub nom. Paylocity Holding Corp. v. Solak*, 154 A.3d 1167 (Del. 2017) ("According to plaintiff, the individual defendants must have known they were violating the law when they approved the Fee–Shifting Bylaw because they took this action 'more than six months after [the amendment to] Section

---

improper. Therefore, the issue . . . is whether the Complaint alleges particularized facts that, if proven, would show that a majority of the defendants knowingly engaged in 'fraudulent' or 'illegal' conduct or breached 'in bad faith' the covenant of good faith and fair dealing."

109(b) became effective.'   This single allegation is insufficient . . . to support a reasonable inference that [the] directors acted with scienter—that they *knew* they were violating the law— when they approved the Fee–Shifting Bylaw.").

In sum, Plaintiff's claims that the aforementioned provisions are "unreasonable and unfair to NBC" are too sparse and conclusory for the Court to determine that Conlee, Hathorn, and Sheridan's actions were "so egregious that there is a substantial likelihood of liability." *Aronson*, 473 A.2d at 815.

### b. Corporate Waste.[17]

At the hearing, the parties agreed that Count II for corporate waste is limited to NBC allegedly paying for N. Caporella's personal use of the company aircraft.   "A board's decisions do not constitute corporate waste unless they are exceptionally one-sided."   *White v. Panic*, 783 A.2d 543, 554 (Del. 2001).   Accordingly, the Supreme Court has defined "waste" to mean "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."   *Id*.   "As a practical matter, a stockholder plaintiff must generally show that the board 'irrationally squander [ed]' corporate assets—for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all."   *Id*.

Plaintiff admitted at the hearing that there is nothing to suggest that the members of the board knew or authorized N. Caporella's personal use of the aircraft.   In other words, there is no board transaction for the Court to scrutinize.   As a result, Plaintiff's corporate waste claim fails. *See In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1327–28 (N.D. Ga. 2016), *appeal dismissed sub nom. Bennek v. Ackerman*, No. 16–17742–DD, 2017 WL

---

[17] Plaintiff brings Count II against N. Caporella, J. Caporella, Bracken, Cook, Conlee, Hathorn, and Sheridan.  *See* ECF No. [1], at 45.

6759075 (11th Cir. Oct. 24, 2017) ("The problem with the Plaintiffs' argument is that there is no transaction. Corporate waste claims typically involve situations where there has been an exchange of corporate assets for no corporate purpose or for no consideration; in effect, waste is a gift. The Plaintiffs cite no case law to suggest anything to the contrary.").

In sum, Plaintiff has not met his burden under either of *Aronson*'s prongs to excuse pre-suit demand on NBC's board. *See Teamsters*, 119 A.3d at 65 ("In the absence of well pleaded allegations of director interest or self-dealing, failure to inform themselves, or lack of good faith, the business decisions of the board are not subject to challenge because in hindsight other choices might have been made instead."). His claims under Delaware law for breach of fiduciary duty and corporate waste must therefore be dismissed.

### B. Securities and Exchange Act.

In Count III, Plaintiff alleges that directors N. Caporella, J. Caporella, Conlee, Hathorn, and Sheridan violated Section 14(a) of the Securities and Exchange Act in connection with the proxy statements filed by the company with the SEC in 2015, 2016, and 2017. *See* ECF No. [1], at 46. Specifically, Plaintiff claims that these proxy statements were deficient because they failed to disclose: (1) that N. Caporella, J. Caporella, and Bracken were or are affiliated with Broad River; (2) that Broad River is the predominant owner of NBC's aircraft; (3) that N. Caporella utilized the airplane for personal trips; and (4) all of the provisions of the Agreement. *See Id*. at 46–47.

"Section 14(a) and Rule 14–A–9 promulgated thereunder require that proxy statements not be false or misleading with regard to any material statement, nor omit to state any material fact necessary in order to make the statements therein not false or misleading. A fact or statement is material if there is a substantial likelihood that a reasonable shareholder would

consider it important in deciding how to vote." *In re The Home Depot, Inc.*, 223 F. Supp. 3d at

1329 (internal citations and quotations omitted). Regarding whether a defendant omitted

important information, a plaintiff "must show that the Board had a duty to disclose the omitted

material fact, which is determined by whether the SEC regulations specifically require disclosure

of the omitted information in a proxy statement, or the omission makes other statements in the

proxy statement materially false or misleading." *Id*. at 1329–30. To sustain a private claim

under Section 14(a), a plaintiff must show "that the proxy solicitation itself, rather than the

particular defect in the solicitation materials, was an essential link in the accomplishment of the

transaction." *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 385 (1970). The transaction at issue,

moreover, must be the source of the plaintiff's injury. *See Id*. In particular, the Eleventh Circuit

Court of Appeals has stated "that Section 14(a) claims must show two types of causation:

transaction and loss causation. In other words, the shareholders must have voted for the . . .

Proxy Statement because of the omission (i.e., transaction causation), and the losses to the

company must have resulted directly from the . . . Proxy Statement vote, not from the omission

itself (i.e., loss causation)." *In re The Home Depot, Inc.*, 223 F. Supp. 3d at 1331 (*citing Edward

J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 796–97 (11th Cir. 2010)).

Plaintiff alleges that the "omissions and misrepresentations were material to a reasonable

investor in deciding to vote on the issues presented by the 2015, 2016 and 2017 Proxies,

including the election of the Current Director Defendants."[18] ECF No. [1], at ¶ 125. Courts,

however, "have . . . regularly dismissed Section 14(a) claims based on the election of directors

because the losses are indirect." *In re The Home Depot, Inc.*, 223 F. Supp. 3d at 1331.

---

[18] The 2016 and 2017 proxy statements show that the election of two directors was on the agenda at each year's annual meeting of NBC shareholders, *see* ECF Nos. [26–4], [26–5], whereas the 2015 proxy statement states that the election of one director and "a non-binding advisory vote on executive compensation" was on the agenda for that year's shareholder meeting, ECF No. [26–6].

For instance, in *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 796 (11th Cir. 2010), the shareholders alleged "that several individual Jabil insiders violated section 14(a) by making false statements in proxy solicitations related to Jabil's stock option compensation policy. . . . They contend[ed] that they relied on these false statements in approving corporate compensation and stock option policies and that the nondisclosure prevented them from removing the offending corporate directors." Relying on the Third Circuit's decision *General Electric Company by Levit v. Cathcart*, 980 F.2d 927 (3d Cir. 1992),[19] the Eleventh Circuit affirmed the dismissal of the proxy solicitation claims because the damages suffered by the shareholders were caused "not by the policies that they approved via proxy, but by management's failure to follow those policies. Additionally, *the election of directors who violated those policies only indirectly caused the shareholders' loss*." *Jabil Circuit, Inc.*, 594 F.3d at 797 (emphasis added).

The same is true in the instant case. Even assuming that (1) the directors had a duty to disclose the information Plaintiff believes should have been included in the proxies; (2) the omitted information was material; and (3) Plaintiff's allegations of materiality are sufficient to demonstrate transaction causation, Plaintiff has failed to show loss causation. Like in *Jabil Circuit*, the reelection of the directors was not an essential link to the supposed losses that Plaintiff complains of: that is, the "wast[ing] of corporate assets" stemming from the duplication

---

[19] In *Cathcart*, the Third Circuit addressed a Section 14(a) claim against corporate insiders based on their alleged non-disclosure of criminal activity and mismanagement of the company. "The plaintiff claimed that the absence of this information caused him to vote to reelect board members and approve corporate governance rules during the class period." *Jabil Circuit, Inc.*, 594 F.3d at 797. The Third Circuit affirmed the lower court's dismissal of the claim, holding that the plaintiff's injuries were too attenuated to support a proxy solicitation claim. *See Id.* (*citing Cathcart*, 980 F.2d at 933). The *Cathcart* court held that the plaintiff's real injuries came from mismanagement of the corporation—not the transactions approved via the proxy solicitation materials—thus reasoning that the harm to the plaintiffs was only indirect and not sufficient to base a Section 14(a) claim. *See Id.* (*citing Cathcart*, 980 F.2d at 933). "Essentially, it was management's failure to follow corporate policies, and not the actual election of directors, that contributed to the shareholder's loss." *Id.*

of services or N. Caporella's personal use of the aircraft, *see* ECF No. [1], at ¶¶ 92, 126, "was not accomplished or endorsed by any proxy solicitation materials," *Jabil Circuit, Inc.*, 594 F.3d at 797. Because the Complaint fails to allege a link between the proxy statements and Plaintiff's alleged damages, Plaintiff's Section 14(a) claim must be dismissed.

## IV.  CONCLUSION

For all of the reasons stated, it is **ORDERED AND ADJUDGED** that

1. Defendants' Motion to Dismiss, **ECF No. [25]**, is **GRANTED.**

2. Plaintiff's Verified Shareholder Derivative Complaint is **DISMISSED with prejudice**.

3. The Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** in Miami, Florida, this 5th day of June, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

24